SILVER, Marc I., Appellant,

v.

MENDEL, M. Mark, Individually, Murray, Daniel E., Individually, and M. Mark Mendel, Ltd.

No. 88–1935.

United States Court of Appeals, Third Circuit.

Argued April 10, 1989.

Decided Jan. 18, 1990.

Richard M. Jordan (argued), David E. Sandel, Jr., White and Williams, Philadelphia, Pa., for appellant.

H. Robert Fiebach (argued), David I. Bookspan, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for appellees.

Before HIGGINBOTHAM, STAPLETON, and ROSENN, Circuit Judges.

1. Count I of the complaint alleges interference with existing contractual relations. Count II alleges interference with prospective contractual relations. Count III alleges wrongful use of civil proceedings. Count IV alleges a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. Count V alleges intentional infliction of emotional distress. Count VI alleges a negligence claim.

2. Although Silver has preserved his position on Count IV before us, he did not argue it on

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

### I.

This is an appeal from a final order in a diversity case dismissing appellant Silver's complaint against appellees M. Mark Mendel, Daniel Murray, individually, and M. Mark Mendel, Ltd. ("the defendants"). We are presented with three principal issues: whether we have jurisdiction to review a non-final March 25, 1987 order dismissing counts I, II, V and VI[1] of the complaint;[2] whether Silver's claims of intentional interference with both existing and prospective contractual relations are barred by an absolute judicial privilege; and whether Silver states a claim for intentional infliction of severe emotional distress. We conclude that we have jurisdiction, that the judicial privilege does not bar the intentional interference claims, and that Silver's complaint does allege conduct sufficiently outrageous to state a claim under Pennsylvania law for intentional infliction of severe emotional distress.

### II.

In reviewing an order dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), we must take as true all the factual allegations in the complaint, and construe the complaint liberally in the complainant's favor. *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). The following narrative account reflects this perspective.

M. Mark Mendel, Ltd. is a legal service corporation incorporated under the laws of the Commonwealth of Pennsylvania. M.

appeal in light of our subsequently vacated decision in the related case of *Marshall–Silver Construction Co. v. Mendel,* 835 F.2d 63 (3d Cir. 1987), *vacated,* —— U.S. ——, 109 S.Ct. 3233, 106 L.Ed.2d 582 (1989). We have since affirmed the dismissal of the Marshall–Silver's RICO claim on remand, *Marshall–Silver Construction Co. v. Mendel,* 894 F.2d 593 (3d Cir.1990), and thus will affirm the dismissal of Silver's RICO claim in this case on the same grounds.

Mark Mendel, a Pennsylvania citizen, is Chairman of the Board and an owner of Barton Engineering ("Barton"); he is also a shareholder, officer, and director of Mendel, Ltd. Daniel Murray, a Pennsylvania citizen, is also an officer of Barton as well as being an attorney who is either a shareholder or employee of Mendel, Ltd.

Silver was the principal of a construction company ("the Construction Company") primarily engaged in the business of serving as general contractor for the building of nursing homes. In addition, Silver derived substantial income from consulting work he did individually for developers and owners of nursing homes and, because of his close identification with the Construction Company, he was often invited to participate in his individual capacity as an equity partner with these developers. These sources of income were independent of his income from the Construction Company.

One of the subcontractors hired by the Construction Company was Barton. In 1984, a series of disputes between Barton and the Construction Company arose. On June 29, 1984, Mendel met with Silver at his office and threatened to: destroy Silver's business; destroy his ability to earn a living; and have him physically injured. By letter dated July 2, 1984, Mendel confirmed some of these threats. Specifically, the letter threatened to: charge Silver with improper activity and manipulation on the drawdown of funds provided for the nursing home development by the U.S. Department of Housing and Urban Development; obtain a temporary restraining order on all of Silver's projects; request action from the U.S. Attorney; and seek the appointment of a receiver for the Construction Company. Mendel concluded his letter by stating that

> [w]e may not get paid in money, but we will get paid in the visceral good feeling that we have taken you out of the market and prevented you from further victimizing honest businessmen. If you think this letter was written in anger, it was not. It was written after careful deliberation and evaluation of what you people really appear to be doing.

29a. In a subsequent letter to appellant dated July 3, 1984, Mendel stated that "I assure you, and this is a threat, and don't kid yourself; your attorney may have told you I can't shut you down, but I'll shut you up and I'll finish you off in the building business.... You have only one single option and one only. It is my office or suffer the wrath and take your licking, which I assure you you are going to get." 31a; 32a. The purpose of these threats was to coerce Silver or the Construction Company into making the disputed payments to Barton.

The complaint also alleges that Mendel made good on his threats by causing Barton to file, without probable cause, a Petition for Involuntary Bankruptcy against the Construction Company. The petition was signed by Murray and filed by Mendel, Ltd. on or about December 28, 1984. Two of the creditors who appeared on the petition, Nester Brothers and R.J. Skelding Company had not authorized the Mendel firm or Barton to include them as petitioning creditors before the Bankruptcy Court. The petition was ultimately dismissed because the petitioners refused to post the approximately $850,000 bond set by the court. However, as a result of the filing of the petition, Dunn & Bradstreet, The Philadelphia Inquirer, Philadelphia Business Journal, and the Legal Intelligencer reported that the Construction Company was insolvent. The widespread publicity ensuing from the filing of the petition had dire consequences for both Silver and the Construction Company. Silver personally suffered the following financial injuries from the defendants' conduct: 1) the loss of a $100,000 development fee to be paid by Shermark Partnership to Silver individually; 2) the loss of a 21% equity interest in Dayton Manor with an estimated value of $250,000; and 3) the loss of his ability to continue his personal business ventures, estimated at $300,000. In addition, the defendants' conduct caused Silver to experience severe emotional distress.

In count I, pertaining to interference with existing contractual relations, the complaint alleges that the filing of the petition prevented Silver from completing

three specific existing contracts. Count II, dealing with the loss of prospective contractual relations, alleges that the filing of the petition caused appellant to lose his bonding capacity, interfered with his ability to obtain credit and damaged his reputation, thereby depriving him of the ability to secure specified construction contracts.

### III.

█ Federal Rule of Appellate Procedure 3(c) requires a notice of appeal to "designate the judgment, order or part thereof appealed from." The defendants stress that Silver's notice of appeal refers only the November 21, 1988 order that dismissed count III alleging wrongful use of civil proceedings. They contend that the notice of appeal, accordingly, did not effect an appeal from the district court's order of March 25, 1987 that dismissed counts I, II, V, and VI of the complaint. Since the time for appeal from the dismissal of those four counts expired 30 days after the November 21, 1988 order without the filing of a notice of appeal making reference to the order dismissing them, defendants contend that this court lacks jurisdiction to review the dismissal of Silver's claims for interference with existing and prospective contractual relations and for intentional infliction of emotional distress. Defendants add, for good measure, that the recent Supreme Court decision in *Torres v. Oakland Scavenger*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) (failure to specify a party in the notice of appeal deprived a Court of Appeals of jurisdiction with respect to that party), precludes this court from applying a harmless error analysis to this jurisdictional defect.

The district court's order of November 21, 1988, not only granted the defendants' motion with respect to count III but also entered "JUDGMENT ... in favor of the defendants M. Mark Mendel, Individually, Daniel Murray, Individually and ... M. Mark Mendel, Ltd. and against the plaintiff Marc I. Silver". 313a. An indispensable element of the judgment so entered was the court's previous dismissal of counts I, II, V and VI. We hold that we have jurisdiction to review the judgment entered on November 21, 1988, including all decisions of the district court necessary to it. *See Murray v. Commercial Un. Ins. Co.*, 782 F.2d 432, 434–435 (3d Cir.1986) (holding that an appeal from an order granting summary judgment on the last count of a complaint also encompasses the interlocutory order granting summary judgment on the other two counts of the complaint where the earlier order was not appealable and the parties had briefed all the issues). Since Silver fully complied with Rule 3(c) with respect to all issues which he raises on appeal, we have no occasion to address the doctrine of harmless error or the Supreme Court's decision in *Torres*.

### IV.

#### A.

Although the Pennsylvania Supreme Court has explicitly adopted the Restatement (Second) of Torts' formulation with respect to the tort of interference with *existing* contractual relations, *Adler, Barish v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1183–1184 (1978), it has not adopted the Restatement (Second)'s formulation with respect to interference with *prospective* contractual relations.[3] In *Thompson Coal*

---

**3.** Section 766B of the Restatement (Second) of Torts (1977) provides:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

   (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

   (b) preventing the other from acquiring or continuing the prospective relation.

Section 767 of the Restatement (Second) then provides a list of several factors that are to be considered in determining whether the interference is "improper." That section provides:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

   (a) the nature of the actor's conduct,

   (b) the actor's motive,

   (c) the interests of the other with which the actor's conduct interferes,

*Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 471 (1979), written two years after the final version of the Restatement (Second) was published, the Pennsylvania Supreme Court referenced the Restatement (Second) section dealing with the latter, *see id.* 412 A.2d at 470, but retained the four elements of the tort in the language of the Restatement (First) of Torts that it had adopted in *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895, 898 (1971).[4] These four elements are: 1) a prospective contractual relation; 2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; 3) the absence of privilege or justification on the part of the defendant; and 4) the occasioning of actual damage resulting from the defendant's conduct. In view of the Pennsylvania Supreme Court's opportunity in *Thompson* to adopt the Restatement (Second), its failure to do so, and its reaffirmation of the tort's four elements derived from the Restatement (First),[5] we are constrained to analyze appellant's claim using the four elements set forth in

    (d) the interests sought to be advanced by the actor,
    (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
    (f) the proximity or remoteness of the actor's conduct to the interference and
    (g) the relations between the parties.

4. Section 766 of the Restatement (First) of Torts (1939) provides:
    Except as stated in Section 698 [re contracts for marriage], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
    (a) perform a contract with another, or
    (b) enter into or continue a business relation with another
is liable to the other for the harm caused thereby.
Section 767 of the Restatement (First) outlines the factors to be considered in determining whether an act is privileged and provides:
    In determining whether there is a privilege to act in the manner stated in § 766, the following are important factors:
    (a) the nature of the actor's conduct,
    (b) the nature of the expectancy with which his conduct interferes,
    (c) the relations between the parties,
    (d) the interests sought to be advanced by the actor and
    (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.

*Thompson,* although we think the result would not be different if we followed the Restatement (Second) in this case.[6]

**B.**

    The first *Thompson* element required Silver to allege that he had a prospective contractual relation with which the defendants interfered. Silver specifies several contracts and bids, then in the negotiating or drafting phase, that were not completed because of defendants' actions. The second element, requiring the purpose or intent to harm the plaintiff by preventing the relation from occurring, is satisfied by Silver's allegations that "[d]efendants' actions were done with the knowledge and intent to interfere with plaintiff's ability to obtain business" and "were willful, malicious and solely for the purpose of destroying plaintiff". 17a. Silver also makes detailed factual allegations to support this alleged intent to harm. With respect to the fourth element, causally related damage,

5. Although one panel of the Pennsylvania Superior Court has adopted the Restatement (Second) formulation, stating that "without justification/privilege" is just another way of saying "improper" and applying section 767 of the Restatement (Second)'s "factor" analysis, *Yaindl v. Ingersoll–Rand,* 281 Pa.Super. 560, 422 A.2d 611, 621–622 (1981), two more recent panels have either relied on the four *Thompson* elements or have analyzed the tort with reference to "absence of justification or privilege." *Vintage Homes v. Levin,* 382 Pa.Super. 146, 554 A.2d 989, 994 (1989) (referencing *Thompson*'s four elements); *Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.,* 340 Pa.Super. 253, 489 A.2d 1364, 1370 (1985) (analyzing the tort with reference to "absence of justification or privilege.").

6. The use of the term "improper" in the Restatement (Second) apparently allows a greater number of factors to be considered in deciding whether certain conduct is privileged. It also apparently allows the burden of demonstrating privilege/justification to be placed on the defendant. In Pennsylvania, however, it is clear that the burden is on the plaintiff to show an absence of privilege/justification. Although we follow the *Thompson* court's four elements in this case, we do not think that the outcome would be different if the Restatement (Second)'s formulation were followed. Here, the main issue is the applicability of a well-established privilege, the judicial privilege.

Silver alleges that he, individually, sustained actual damages resulting from defendants' conduct in the loss of the above mentioned contracts which, with other prospective losses, totalled in excess of $300,000 annually. Thus, as to three of the four elements of the interference with prospective contractual relations tort, there is no doubt that Silver's complaint states a cause of action. Defendants do not argue otherwise.

The remaining issue is whether Silver alleged facts sufficient to meet the third element set forth in *Thompson,* the absence of a privilege or justification. Defendants argue that they are protected from liability in this case because the actions for which Silver seeks to hold them liable are protected by the absolute immunity of the judicial privilege.

As an initial matter, we conclude that although Silver did not use the words "without privilege or justification" in his complaint, he has alleged sufficient facts to allow us to determine whether a privilege protects the defendants' alleged actions. We further conclude that the Pennsylvania Supreme Court would find that the defendants' alleged conduct was not protected by the judicial privilege.[7]

In *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351 (1986), the Pennsylvania Supreme Court noted that immunity under the judicial privilege doctrine applies only to liability based on "those communications which are issued *in the regular course of judi-*cial proceedings* and which are *pertinent and material to the redress or relief sought.*" 507 A.2d at 353 (emphasis in original). This is consistent with the rationale identified by the *Post* court as supporting the privilege: the "privilege exists because there is a realm of communication essential to the exploration of legal claims that would be hindered were there not the protection afforded by the privilege."[8] 507 A.2d at 355. Without the protection of the privilege for communications necessary to such exploration, access to the courts would be impaired, witnesses would be intimidated and lawyers' efforts in pursuit of their clients causes would be chilled. *Id.* at 355.

In this case it is alleged that the defendants caused an involuntary petition in bankruptcy to be filed without having probable cause to believe in the merit of the petition and for a purpose other than the securing of redress from the court. Based on these allegations, we are confident that the Supreme Court of Pennsylvania would conclude that liability imposed in Silver's interference with prospective contractual relations claim would not be predicated on any communication "issued in the regular course of judicial proceedings," "pertinent and material to the ... relief sought," or "essential to the exploration of claims" in litigation.

The judicial privilege has long existed in jurisdictions which, like Pennsylvania, recognize the tort of wrongful use of civil

---

7. The Supreme Court of Pennsylvania has also offered guidance as to when conduct which is not clearly protected by an established privilege is nonetheless "justified." In *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895, 899 (1971), the court stated that:

> The absence of privilege or justification in the tort under discussion [interference with prospective contractual relations] is closely related to the element of intent. As stated by Harper & James, The Law of Torts, § 6.11, at 513: "... where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability." What is or is not privileged conduct in a given situation is not susceptible of precise defini-

tion. Harper & James refer in general to interferences which "are sanctioned by the 'rules of the game' which society has adopted", and to "the area of socially acceptable conduct which the law regards as privileged".....

Although not argued separately on appeal, we conclude not only that appellees' conduct was not protected by the judicial privilege, but also that it was otherwise without legal justification; appellees' conduct was clearly not sanctioned by society's "rules of the game."

8. We do not express an opinion on whether, if defendant's conduct had been in the regular course of justice, the Supreme Court of Pennsylvania would extend the protection of the privilege beyond defamation actions to the ones at issue here.

proceedings. These two policies—protection of communications necessary to the litigation of claims and imposition of liability for wrongful use of civil proceedings—can coexist because imposition of liability for the wrongful use of civil proceedings occurs only when litigation is instituted both without probable cause *and* primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based [9] and because, when these requirements are met, immunity for the filing of the complaint is not necessary to further the interests protected by judicial immunity.

Our point here is not that the defendants in this case are liable for wrongful use of civil proceedings. We agree with the district court that Pennsylvania's Dragonetti Act, 42 Pa.C.S.A. §§ 8351–8354, which codi-

fies this common law tort, gives a cause of action only to the party wrongfully sued—here the Construction Company.[10] Rather, our point is that Pennsylvania would not have the Dragonetti Act if Pennsylvania's judicial privilege protected the filing of an action without probable cause and primarily for a purpose other than to secure relief.[11]

## V.

◼ We now turn to appellant's claim for interference with existing contractual relations. As noted above, the Pennsylvania Supreme Court has adopted the Restatement (Second)'s formulation with respect to this tort.[12] *Adler, Barish,* 393 A.2d at 1183. Accordingly, we look to see if Silver has alleged: (1) the existence of

---

**9.** Section 674 of the Restatement (Second) § 674 defines the tort of wrongful use of civil proceedings as follows:

One who takes an active part in the initiation, continuation or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if

  (a) he acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based, and

  (b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

Section 678 describes a special application of § 674 liability as follows:

One who takes an active part in initiating against another civil proceedings alleging the other's insanity or insolvency is subject to liability caused thereby, if

  (a) he acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim on which the proceedings are based, and

  (b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

*See* The Dragonetti Act, 42 Pa. C.S.A. §§ 8351–8354.

**10.** We need not decide whether the Dragonetti Act has preempted this tort. We believe that if the Pennsylvania Supreme Court concluded that the Act did not, it would look to the Restatement (Second) and reach the same result. With respect to preemption, however, we note that there is no basis for asserting that the Dragonetti Act was intended to foreclose liability when all of the elements of the tort of interference with advantageous relations are present. The purpose of the Act was to expand liability for the tort of wrongful use of civil proceedings by

eliminating the "English Rule" that required the arrest of the person or seizure of the property as a necessary element of the tort. *Walasavage v. Nationwide,* 633 F.Supp. 378, 379 (E.D.Pa.1986); 42 Pa.C.S.A. § 8351(b).

**11.** Appellees cite three cases to support their position that the judicial privilege bars Silver's interference claims. *Pelagatti v. Cohen,* 370 Pa. Super. 422, 536 A.2d 1337 (1987) (ostensibly extending the judicial privilege to interference with existing and prospective relations contractual claims); *Brown v. Delaware Valley Trans. Prog,* 372 Pa.Super. 629, 539 A.2d 1372 (1988) (extending the privilege to civil conspiracy, mutilation of corpse, and assault and battery); *Moses v. McWilliams,* 379 Pa.Super. 150, 549 A.2d 950 (1988) (en banc) (privilege extended to protect doctor for liability from any breach of patient-client confidentiality for his statements made in a medical action brought by patient against another doctor). All these cases, however, are distinguishable in that all the communications at issue in them occurred within the "regular course of justicial proceedings," and protection of them was, accordingly, necessary to permit the proper functioning of the judicial system.

**12.** Section 766 of the Restatement (Second) provides:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

one or more contracts; (2) the purpose or intent to harm plaintiff by preventing the completion of the contractual relation(s); (3) conduct by defendant which is not proper as a matter of law and which a factfinder could reasonably find improper; and (4) harm actually resulting from defendants' actions. *See Adler, Barish*, 393 A.2d at 1183; Restatement (Second) § 707 comment 1.

There is no serious dispute that appellant alleged the existence of contracts that were not fulfilled (e.g., the Shermark Partnership, Dayton Manor, and Cumberland Convalescent Center contracts), actual damage to himself individually (e.g., loss of a $100,000 development fee on the Shermark contract, and loss of a 21% equity interest in Dayton Manor estimated at $250,000), and an intent on the part of the defendants to "interfere with the contractual rights of plaintiff." 15a. The principal dispute between the parties is whether appellees' conduct was protected as a matter of law. We conclude that it was not.

We start with the conclusion, earlier reached, that the defendants' filing of the bankruptcy petition was not protected by the judicial privilege. However, that conclusion does not end the inquiry under § 767 [13] of the Restatement (Second), which defines "improper," because conduct may be proper even if it is not protected by a clearly established privilege. An analysis of § 767's factors demonstrates, however, that the defendants' conduct was not "proper" as a matter of law. Silver alleges a desire by the defendants to bring injury to him and, as comment d to § 767 states, "[a] motive to injure another or to vent one's ill will on him serves no socially useful purpose." Silver's interests with which appellees interfered were socially valuable, providing him with income and contributing to the construction of useful nursing homes. The interest sought to be advanced by the defendants, the "visceral good feeling that we have taken you out of the market ...," is not socially desirable. Likewise there is no socially redeeming val-

ue to protecting the malicious filing of an involuntary bankruptcy petition. Finally, the defendants and Silver were not competitors, thus comment i's indication that such a relationship deserves greater protection does not apply. In short, Defendant's conduct is neither protected by the judicial privilege, nor otherwise "proper" as a matter of law.

Since the complaint alleges conduct which is not protected as a matter of law, the question of whether defendants' conduct is improper is ultimately one for a factfinder. Restatement (Second) § 767 comment 1 ("Here, as with negligence, when there is room for different views, the determinations of whether interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question."); *see Breslin v. Vornado*, 559 F.Supp. 187, 191 (E.D.Pa.1983).

▪ The defendants further urge, in the alternative, that under the Restatement (Second)'s formulation of the tort, a cause of action for interference with contractual relations based on the bringing of an "improper" suit lies only where the suit has been filed against the plaintiff's customers. They suggest that, in the context of this case, this means that the suit against Silver's Construction Company cannot be the basis for an interference with contractual relations claim. To support their position, defendants quote from § 767, comment c:

> A typical example of this situation is the case in which the actor threatens the other's prospective customers with suit for infringement of his patent and either does not believe in the merit of his claim or is determined not to risk an unfavorable judgment and to rely for protection upon the force of his threats and harassment.

We find the defendants' reading of the Restatement unduly restrictive. Comment k of § 766,[14] entitled "Means of Interfer-

---

13. *See* supra, note 3.

14. Certain comments of § 766, including comment k, are incorporated by reference into § 767 by comment c of § 767.

ence," states that there "is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. . . ." This passage and comment c's characterization of the hypothetical case relied on by defendants as "a typical example" indicate that the "improper" suit need not necessarily be filed against a customer in order to provide a predicate for a claim under section 766; any "improper" suit that has the requisite effect on the plaintiff's contractual relations will suffice.[15]

## VI.

■ Finally, we turn to whether Silver's claim for intentional infliction of severe emotional distress was properly dismissed. The district court did not indicate why it dismissed this claim and, accordingly, we do not know which of the four elements of this tort it believed Silver's pleading failed to satisfy.[16] The defendants advance only two reasons why the dismissal should be upheld: (1) Pennsylvania law does not recognize the tort of intentional infliction of severe emotional distress, and (2) even if it did, the conduct alleged, as a matter of law, is not "outrageous." We find neither contention persuasive.

Although the opinion of the Pennsylvania Supreme Court in *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988 (1987) has caused considerable speculation as to whether Pennsylvania will recognize the tort of intentional infliction of severe emotional distress, this court has recently predicted that Pennsylvania's highest court will ultimately embrace it. *Williams v. Guzzardi*, 875 F.2d 46, 51 (3d Cir.1989). Nothing has since been said by the Supreme Court that causes us to change our prediction on this issue.

"We recognize that Pennsylvania courts have been cautious in permitting recovery for intentional infliction of severe emotional distress," *Williams*, 875 F.2d at 52, and in particular, that conduct, to be found sufficiently "outrageous" to give rise to liability, must be both extreme and very offensive to the moral values of society.[17] Nevertheless, we are unwilling to say that the Pennsylvania courts would find wanting as a matter of law a claim alleging that the defendants threatened the plaintiff with physical injury and the destruction of his business in order to extort money from him and thereafter carried out part of that threat. The Restatement (Second) identifies extortionate threats of this kind as a paradigm of the kind of outrageous behavior that gives rise to liability when it occasions severe emotional distress.[18]

---

15. An "improper" bankruptcy petition against a person holds as much potential for interference with his or her contractual relations as the threatened patent infringement suits in the Restatement example. Although the involuntary bankruptcy petition in this case was filed against the Construction Company and not Silver individually, Silver adequately alleges a causal connection between the filing and injury to him as an individual. Defendants are entitled to challenge these allegations, but they are sufficient to withstand dismissal at this stage.

16. Although we recognized in *Williams*, 875 F.2d 46, 52 (1988), that Pennsylvania's formulation of the tort may not exactly track that of the Restatement (Second), we did outline its four elements: 1) the conduct must be extreme and outrageous; 2) the conduct must be intended; 3) the conduct must cause emotional distress; and 4) the distress must be severe. *Id.; Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979).

17. While questioning whether this tort should be recognized in Pennsylvania, the *Kazatsky*

court accepted the Restatement (Second)'s definition of "outrageous":

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

527 A.2d at 991 (quoting the Restatement (Second) § 46 comment d).

18. Illustration 2 to Comment d of § 46 posits the following hypothetical case:

2. A, the president of an association of rubbish collectors, summons B to a meeting of the association, and in the presence of an intimidating group of associates tells B that B has been collecting rubbish in territory which the association regards as exclusively allocated to one if its members. A demands that B pay over the proceeds of his rubbish collection, and tells B that if he does not do so the association will beat him up, destroy his truck, and put him out of business. B is badly frightened, and suffers severe emotion-

## VII.

To summarize, we have concluded that Silver must be permitted to go forward on Count I (interference with existing contractual relations), Count II (interference with prospective contractual relations), and Count V (intentional infliction of severe emotional distress).[19] While our opinion has not engaged in an independent analysis of Count III (wrongful use of civil proceedings), Count IV (RICO), and Count VI (negligence), we have further concluded that the district court properly dismissed those counts. Accordingly, we will reverse the judgment of the district court and remand for further proceedings on Counts I, II, and V consistent with this opinion.

---

al distress. A is subject to liability to B for his emotional distress, and if it results in illness, A is also subject to liability to B for his illness.

19. The plaintiff alleged in Count V that the defendants' actions "were made with the specific intention of inflicting severe emotional distress," and in fact caused him to suffer "personal embarrassment, humiliation and severe mental and emotional harm, distress and suffering." 21a–22a. The plaintiff's allegations are sufficient in this case to withstand a motion to dismiss. However, to survive a motion for sum-

mary judgment, the plaintiff must still present "competent medical evidence of causation and severity" of his emotional distress, as well as proof that the alleged conduct was "both intentional and outrageous." *Williams*, 875 F.2d at 52.

