Willard **STITZELL**, D.O., Plaintiff,

v.

**YORK MEMORIAL OSTEOPATHIC HOSPITAL, Martin Lasky, D.O., Michael L. Mitrick, D.O., Dean Natchigall, D.O., Defendants.**

**C.A. No. 89–0147.**

United States District Court,
M.D. Pennsylvania.

Jan. 25, 1991.

Gerald J. Williams, Williams & Cuker, Mark R. Cuker, Williams & Cuker, Philadelphia, Pa., for plaintiff.

Christopher W. Mattson, Barley Snyder Cooper & Barber, Lancaster, Pa., for defendants.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

The plaintiff, Willard Stitzell, D.O., filed this lawsuit after he terminated his relationship as a neurosurgeon with the defendant, York Memorial Osteopathic Hospital (Memorial). Plaintiff believes that his departure from the Hospital was caused by the defendants' wrongful conduct in connection with Hospital proceedings dealing with his professional competency and clinical privileges. The defendants' motion for summary judgment and the plaintiff's motion for partial summary judgment on count I of his complaint are currently before the court.

Besides Memorial, others affiliated with the Hospital and originally named as defendants were Martin Lasky, D.O., Paul Shellenberger, D.O., Royce Skaggs, D.O., Michael L. Mitrick, D.O., Dean Nachtigall, D.O. and Donald Eckert. The complaint contains six counts setting forth causes of action for: (1) breach of contract; (2) breach of contract or in the alternative promissory estoppel; (3) federal antitrust violations; (4) a state antitrust violation; (5) tortious interference with contractual relations; and (6) civil conspiracy.

During the course of discovery, the plaintiff agreed that the action should be dismissed as to defendants Eckert, Shellenberger and Skaggs and an order to that effect, dated August 9, 1990, was entered dismiss-

ing the claims against these defendants with prejudice. The plaintiff also agreed during the briefing on the defendants' motion that the federal and state antitrust claims could be dismissed.[1] We are thus faced only with the remaining state law claims as asserted against the remaining defendants, Memorial, Lasky, Mitrick and Nachtigall. We will evaluate the motions under the well established standard. *See Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir.1989).

## II. *Background.*

The following background has been gleaned from the depositions, exhibits and other discovery material submitted by the parties. Plaintiff, an osteopathic neurosurgeon, joined Memorial's medical staff in June of 1983. The Hospital recruited him to take the place of its prior neurosurgeon who had died. His practice overlapped with that of defendants Mitrick and Nachtigall who had clinical privileges at Memorial for orthopedic surgery. The common areas of practice were lumbar spine surgery, anterior cervical spine surgery and carpal tunnel surgery of the wrist.

In 1985, Dr. Lawrence Adams, a neurosurgeon on staff, complained to Dr. Lasky, Memorial's Medical Director, about Dr. Stitzell's performance of an operation in which he had assisted Dr. Stitzell. Dr. Lasky and Dr. Adams met with several other doctors on the staff, none of whom were Mitrick or Nachtigall, and it was decided that an independent review of Dr. Stitzell's charts would be undertaken by InterQual, Inc., a company engaged in the business of evaluating physician competence. The matter would then be referred to the Credentials Committee, the appropriate body under Memorial's Bylaws to consider physician expertise and proficiency. After evaluating Dr. Stitzell's charts in an anonymous fashion, InterQual prepared a report which concluded that there were

several areas of concern about Dr. Stitzell's proficiency, including his surgical judgment and excessive blood loss during his operations. Thereafter, because of Dr. Stitzell's handling of two other cases, Dr. Lasky decided, pursuant to authority conferred upon him by the Hospital's Bylaws, to summarily suspend his clinical privileges and so notified the plaintiff on October 31, 1985.

The Credentials Committee had the authority to review the summary suspension. Dr. Mitrick was a member. On November 4, 1985, the date already set to review the InterQual report, the Committee listened to presentations from Dr. Lasky, Dr. Stitzell, and Dr. McCormick, the chairman of the Department of Surgery. The Credentials Committee made a recommendation to the Board of Trustees that Dr. Stitzell's surgical privileges be suspended until he completed one year of training equivalent to the final year of training for a neurosurgical residency.

Plaintiff then invoked his right under the Bylaws to a hearing on the suspension of his privileges. An Ad Hoc Hearing Committee of three physicians was formed, none of whom was a competitor of the plaintiff. A local attorney was named as the hearing officer. In accordance with the procedure set forth in the Bylaws, witnesses for the Hospital and the plaintiff testified, there was cross-examination, and other evidence was submitted. Plaintiff was represented by counsel. The hearing took place on three separate days, December 19, 1985, January 20, 1986 and February 3, 1986. On March 13, 1986, the Hearing Committee recommended to the Board of Trustees that a monitoring system be imposed rather than a suspension. In accordance with the Bylaws, the Credentials Committee reviewed the recommendation of the Hearing Committee and made its own recommendation to the Board. While noting that it believed that its original recommendation of suspension was proper,

---

1. The dismissal of the only count containing the federal questions does not destroy our jurisdiction since plaintiff has also invoked diversity jurisdiction. *See* 28 U.S.C. § 1332(a). Plaintiff was a citizen of Maine at the time he brought this suit.

We would also note that the elimination of the federal antitrust claims also eliminates the civil conspiracy claim in count VI since the latter cause of action is predicated upon count III, the federal antitrust claims.

the Credentials Committee's final recommendation was that plaintiff's suspension be lifted, that he obtain hands-on experience in spinal surgery and craniotomies, and that he be monitored by another neurosurgeon for a minimum period of six months while performing surgery at Memorial. This monitor was to be physically present during the entire surgical procedure and was to make monthly reports.

Plaintiff appealed to Memorial's Board of Directors, the final authority on the suspension or termination of physician privileges. Thereafter, the parties negotiated a compromise solution which included a monitoring program and Dr. Stitzell abandoned his appeal. The implementation of the monitoring program was delayed because Dr. Adams who was apparently supposed to be the monitor decided not to do so. In the Fall of 1986, plaintiff obtained the services of Dr. Richard B. Kanoff of Philadelphia to be his monitor. The suspension of his privileges was lifted on December 3, 1986, and the monitoring program began.

The parties executed an undated written memorandum concerning their agreement. The memorandum provided, in pertinent part, that:

1. The monitoring program would be for a minimum period of six months;

2. The monitor would be present in the operating room while Dr. Stitzell was performing surgery; and

3. Dr. Stitzell would obtain additional training from Dr. Kanoff consisting of "hands-on experience" in spinal surgery and craniotomies. This training would include no less than twenty spinal surgeries and ten craniotomies.

Within six months Dr. Stitzell had satisfied the hands-on requirement of the agreement. His monitor had also submitted glowing reports about his competence. On June 29, 1987, plaintiff made an oral and written application before a meeting of the Credentials Committee for restoration of his privileges. The Committee decided to obtain more information. At a subsequent meeting on July 14, 1987, Dr. McCormick argued in favor of restoring plaintiff's privileges. Dr. Mitrick was present but abstained from the vote. The Committee decided to recommend to the Board that the monitoring requirement be removed, but that Dr. Kanoff would still have to review Dr. Stitzell's charts.

Dr. Lasky opposed the recommendation when it came before the Board. According to his deposition testimony, he did so because he was concerned about the small number of procedures, about eight, that Dr. Stitzell had performed at Memorial during the first six months of the monitoring agreement. He discounted the hands-on experience because this had been done under the supervision of Dr. Kanoff. Dr. Stitzell had also performed a recent operation in which there had been excessive blood loss. Dr. Lasky did not attribute this to the Plaintiff's lack of skills but did note it as a reason for continuing the monitoring program. The gist of his position was that the bare minimum of time set forth in the monitoring agreement was insufficient to properly assess Dr. Stitzell's skills. Dr. McGraw, the Chairman of the Credentials Committee, explained its position on the chart review. Dr. Stitzell was not given an opportunity to speak to the Board.

On August 31, 1987, the Board decided that the monitoring program would be continued for an additional "minimum" period of twelve months "or longer if deemed necessary." Plaintiff was so notified by letter, dated September 1, 1987. The Board subsequently rejected plaintiff's attorney's request for a hearing or an appeal of its decision. In a letter, dated September 10, 1987, it pointed out that the monitoring agreement was to be for a minimum period of six months and set no maximum limit on its duration. Thus, the Board considered its action to be well within its rights under the agreement and that no hearing or appeal was necessary. The plaintiff then decided to leave the Hospital. He purchased a family practice in Maine and instituted this lawsuit.

III. *Discussion.*

The defendants argue preliminarily that this action is barred because the plaintiff agreed to an exculpatory clause when he

executed his application for privileges. There is a similar provision in the Bylaws at Art. VI, Part C, § 4. As found in plaintiff's application, the clause provides immunity for conduct "relating, but not limited to" a broad class of proceedings that might be undertaken in connection with plaintiff's professional conduct such as "proceedings for suspension or reduction of clinical privileges," a "summary suspension," or "matters or inquiries concerning [plaintiff's] professional qualifications." The clause reads, in pertinent part, that:

[t]o the fullest extent permitted by law, I extend absolute immunity to, and release from any and all liability, the hospital and its authorized representatives and any third party as defined in subsection (c) below for any acts, communications, reports, records, statements, documents, recommendations or disclosures involving me ... received by this hospital ... to, from, or by any third party, including otherwise privileged or confidential information, made or given in good faith....

Citing, among other cases, *Garbish v. Malvern Federal Savings And Loan Ass'n*, 358 Pa.Super. 282, 517 A.2d 547 (1986), defendants contend that this language is specific enough to exculpate them from liability for any of their actions in connection with their investigation of plaintiff's clinical skills. Plaintiff counters that the same case supports his contention that the language does not immunize the defendants from liability.

■ We first note that the clause protects only good faith conduct on the part of Memorial, its physicians, and other persons who may provide information concerning the competency of doctors on the Hospital's staff. Part of the plaintiff's case is that the defendants, in essence, acted in bad faith in connection with the proceedings against him. Thus, the clause would not bar the prosecution of this action to the extent that the plaintiff has presented sufficient evidence of the defendants' bad faith.

■ Second, as to the claim set forth in count II of the complaint, we conclude that the clause does meet the strict standard imposed under Pennsylvania law before it can be given effect. As stated by the Pennsylvania Superior Court in *Garbish*, an exculpatory clause must, among other things: (1) be "construed strictly;" (2) "delineate the intention of the parties with the greatest particularity ... in clear, direct, and unmistakable language;" and (3) "be construed against the party seeking to be protected by it." 358 Pa.Super. at 302, 517 A.2d at 557. But at the same time, the requirement of strict construction does not preclude our use of common sense in interpreting the exculpatory clause. *See Weiner v. Mt. Airy Lodge, Inc.*, 719 F.Supp. 342 (M.D.Pa.1989) (applying Pennsylvania law).

■ As we read this clause, it clearly applies to conduct and testimony on the part of the Hospital or third parties arising from proceedings and appeals dealing with physician competency. This would include all of the proceedings undertaken in the instant case since they all arose from the plaintiff's summary suspension and subsequent appeals, proceedings specifically mentioned in the clause. It would further include the monitoring agreement, and actions taken by Memorial pursuant to that agreement, since the agreement was an act on the part of the Hospital relating to plaintiff's appeal concerning his clinical privileges. It does not matter that the exculpatory clause speaks broadly of "any and all liability," *see Weiner, supra* (citing *Zimmer v. Mitchell and Ness*, 253 Pa.Super. 474, 385 A.2d 437 (1978)), as long as it is specific enough to warn the plaintiff of the clause's purpose and scope. The clause has met this standard and we are satisfied that Dr. Stitzell understood the exculpatory clause and what it was intended to do—permit the Hospital to conduct a full and unfettered investigation of his professional skills if the need ever arose.

We reject his argument that, given the circumstances surrounding his execution of the application, he could only have thought that it applied solely to the initial investigation of his background while Memorial contemplated hiring him. The application clearly extends the clauses's coverage to the "duration of [Dr. Stitzell's] appoint-

ment." (brackets added). We therefore conclude that any claim for breach of contract or promissory estoppel is barred by the exculpatory clause to the extent that plaintiff seeks to litigate the good faith actions of the Hospital or physicians on its staff.[2]

■ The same conclusion does not apply to count I of the complaint, which attacks the failure of Memorial to grant an appeal ostensibly required by the Bylaws. The exculpatory clause cannot be read to confer upon Memorial the right to ignore a procedural protection it had contracted to provide plaintiff. In other words, plaintiff could not have understood that he was agreeing to immunize Memorial from a complete failure to provide the process it had promised. He could only have been understood to have agreed that, once proceedings were underway, he would not contest good faith conduct undertaken in connection with those proceedings.

■ We will therefore address the merits of plaintiff's motion for partial summary judgment. Plaintiff seeks summary judgment on count I of his complaint which alleges that Memorial breached its contract with him by failing to grant him a hearing after its decision on August 31, 1987, to extend the monitoring program for twelve months. Plaintiff contends that, while the monitoring agreement is silent on this point, it is supplemented by the Bylaws which mandate that a hearing be granted when a staff member appeals from a denial of an increase in clinical privileges. *See* Art. VIII, Part B, § 2(f), dealing with grounds for a hearing.[3] Both sides agree that hospital bylaws are contractual and a breach is redressable in court. *See Miller v. Indiana Hospital*, 277 Pa.Super. 370, 419 A.2d 1191 (1980).

Defendants counter that the Board's action was not a denial of a request for an increase in clinical privileges. Plaintiff already had the right to exercise all the clinical privileges he was seeking. The Board merely refused to lift a condition imposed upon the exercise of those privileges. Hence, the Bylaws did not require a hearing. Additionally, the Board's decision was within the terms of the monitoring agreement which contained no explicit time limit. There was a minimum period of six months, but by its very terms this minimum period could not also define the maximum length of the agreement.

Plaintiff argues at great length in his supporting and opposing briefs why the Bylaws must be interpreted to require that he had the right to a hearing in these circumstances. We do not think we have to reach the issue of whether Dr. Stitzell's request that the monitoring requirement be lifted was a request for an increase in clinical privileges or not. Nor do we have to examine the organization, scope, or pattern of the Bylaws for arguably analogous situations in which a hearing could be required. We believe that the monitoring agreement controls here.

That agreement was a settlement of the controversy originating with the plaintiff's summary suspension by Dr. Lasky. It ended an appeal to the Board by the plaintiff and supposedly addressed the concerns of both sides. To that extent it modified the provisions of the Bylaws and we must look to it to determine the relative rights of the parties.

The agreement, even if we take into account the plaintiff's position that it is not integrated, provides the plaintiff with no right to a hearing if the Hospital decides that it should not be terminated upon the plaintiff's request. We must therefore deny the plaintiff's motion for summary judgment and, in fact, enter summary judgment in the defendants' favor on this

---

**2.** We reject defendants' position that promissory estoppel cannot be asserted when there is an existing contract although it may turn out that the same reasons which would deny recovery on a contract would support denial of a promissory estoppel claim.

**3.** This section limits the right to a hearing to certain situations. Captioned "Grounds for Hearing," it provides that "[n]o matter or action other than those hereinafter enumerated shall constitute grounds for a hearing" and then goes on to list, among other grounds, a "denial of requested increased clinical privileges."

count. We turn now to defendants' motion for summary judgment.

■ Defendants argue that there is no basis for the tortious interference with contract claim set forth in count V against the individual defendants. They contend that the record shows that these defendants acted out of concern for patient safety rather than out of a desire to injure the plaintiff or eliminate him as a competitor.[4]

To succeed on this cause of action, plaintiff must show the following:

> (1) the existence of one or more contracts; (2) the purpose or intent to harm plaintiff by preventing the completion of the contractual relationship(s); (3) conduct by defendant which is not proper as a matter of law and which a factfinder could reasonably find improper; and (4) harm actually resulting from defendants' actions.

*Silver v. Mendel*, 894 F.2d 598, 604–05 (3d Cir.1990) (applying Pennsylvania law).

In analyzing whether the defendants' conduct was improper, we are guided by the following factors, which can be given unequal weight depending upon the circumstances:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

*Id.* at 601 n. 3 (quoting the Restatement of Torts (Second) § 767 (1979)).

Defendants argue that their conduct was proper by focusing upon five discrete factual occurrences in this case, four of them consisting of proceedings on plaintiff's privileges. Defendants analyze them one by one for evidence of wrongful conduct and assert that there was none. Plaintiff says that this is the wrong approach. The defendants' conduct has to be considered as a whole. Additionally, Drs. Mitrick and Nachtigall acted in a more indirect way by a campaign of gossip and innuendo which influenced the decisionmakers on the Committees and whose purpose was to eliminate a competitor. Dr. Lasky aided and abetted this scheme.

We see merit in the defendants' approach. The plaintiff's broad analysis tends to hide flaws in his case with colorful language about wrongdoing and conspiracy. As discussed below, when plaintiff does begin to discuss specific incidents, the record in the most probative instances does not match the arguments being made. We agree with the defendants that no cause of action for tortious interference with contract has been established because plaintiff cannot show that the defendants' conduct was improper under the factors listed above. Our own analysis is as follows.

We begin with Dr. Lasky. Plaintiff must necessarily place a great deal of emphasis upon his conduct and ostensible connection with Drs. Mitrick and Nachtigall because Dr. Lasky initiated the events which culminated in this lawsuit by summarily suspending Dr. Stitzell. However, despite an unsuccessful attempt to connect him to Dr. Nachtigall by way of a supposed common business venture (Stitzell deposition at p. 219–21), plaintiff has not established any connection between the two or why Dr. Lasky would have cooperated with plaintiff's surgical competitors in an effort to unfairly eliminate his clinical privileges. Dr. Lasky was an employee of Memorial who would have had the Hospital's interests at heart, including the Hospital's concerns about head trauma patients bypassing the Hospital because it did not have a neurosurgeon on staff. Dr. Stitzell's practice did not overlap that of Drs. Nachtigall and Mitrick in this area. Additionally, the suspension was motivated, in part, as a result of a complaint of Dr. Adams, not of Drs. Nachtigall and Mitrick. In short, Dr.

---

**4.** Defendants also argue that plaintiff has not established what contract the defendants may have interfered with. We reject this argument.

It is apparent that plaintiff is contending that defendants improperly interfered with his contract for staff privileges with the Hospital.

Lasky's conduct here was independent and can only be considered as arising from his concern about patient care.

The bulk of the plaintiff's case depends upon the actions of Drs. Nachtigall and Mitrick. During the time that plaintiff was being recruited, however, they never opposed bringing a neurosurgeon on staff. In fact, Dr. Lasky testified that the feeling in the Hospital, even in the orthopedics department, was that Memorial was losing too many neurosurgical patients and that a neurosurgeon should be added. (Lasky deposition at p. 28–29). If these doctors were going to eliminate a potential competitor, this would have been the time to act.

Drs. Nachtigall and Mitrick also, at best, had a tenuous contact with the definitive actions taken against Dr. Stitzell. Dr. Mitrick was on the Credentials Committee but, according to Dr. Lasky, a non-voting member of the Committee, his input was limited to answering technical questions when Dr. Stitzell's case was under discussion. He never volunteered any criticism of Dr. Stitzell, and he would often leave the room during the other physicians' conversations on the matter. (Lasky deposition at p. 40–41). He did, in fact, abstain during the Credentials Committee's consideration of plaintiff's request that the monitoring program be lifted.[5] Moreover, neither of these defendant doctors was a member of the Ad Hoc Hearing Committee which heard plaintiff's appeal of the recommended suspension of his surgical privileges. Dr. Stitzell has admitted that the Hearing Committee was not biased against him. (Stitzell deposition at p. 111–14). He has also not made an issue of the proceedings before the Hearing Committee.

There is some evidence that Drs. Mitrick and Nachtigall could have acted improperly. As noted, plaintiff was a competitor of these doctors in certain areas of practice. This could have supplied them with a motive to eliminate him. In fact, they did

approach Drs. Lasky and McCormick and criticize plaintiff's skills. (*See, e.g.,* McCormick deposition at p. 23, 26, Exhibit H to plaintiff's opposition brief to defendants' motion for summary judgment). But an interest in patient care would make these comments perfectly legitimate. Society has recognized this interest as well by passing legislation protecting peer review activities. *See* The Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 *et seq.* Plaintiff must accept the hard fact that his competitors are often in the best position to assess his competence. And as long as he has received the procedural safeguards contractually granted to him by the Bylaws, *see Miller v. Indiana Hospital, supra; Posner v. Lankenau Hospital,* 645 F.Supp. 1102 (E.D.Pa.1986), we conclude that this evidence, even if true, does not entitle him to get to a jury on a tortious interference claim.

Our conclusion is buttressed by the plaintiff's failure to show how Drs. Mitrick and Nachtigall's comments resulted in wrongful or erroneous consideration of his case by the various Hospital bodies. He does show that rumors were circulating through the Hospital about him and he would trace these to the defendants. But he has not presented any evidence of an orchestrated campaign by these defendants or that the gossip originated with them. When he does refer to specific rumors, such as the list compiled by Dr. Lasky (Exhibit N to plaintiff's opposition brief to defendants' motion), he only illustrates how disconnected his treatment was from the atmosphere he complains about. Dr. Lasky investigated these charges and found them meritless.

We recognize that plaintiff has submitted other evidence concerning Drs. Mitrick and Nachtigall. He testified that these competitors prohibited orthopedic residents from assisting at his operations, that they were political powers at Memorial, that they had sent nurses and residents

---

5. This was a special meeting of the Committee which was called for the sole purpose of considering the request of Dr. Stitzell that the monitoring be lifted. Plaintiff therefore questions why Dr. Mitrick was there at all if not to exert an improper influence. However, the decision was favorable to Dr. Stitzell in that the Committee recommended a system of chart review to replace the monitor. We therefore do not see how Dr. Mitrick's presence at this meeting is probative.

into the operating room to observe his surgery, and that prior to his suspension Dr. Nachtigall had contacted Flint, Michigan, his prior place of employment, to check up on him. We do not consider this evidence sufficiently probative in light of the procedural safeguards employed by the Hospital.

We consider other evidence totally irrelevant. Plaintiff asserts that Memorial treated Dr. Adams more favorably than it did him. The Hospital's treatment of Dr. Adams has no bearing upon plaintiff's competence and whether he should be permitted to continue to treat its patients. Plaintiff has also submitted an affidavit from Dr. Marvin Keagy who asserted that he happened upon Dr. Nachtigall asking Dr. Ilfelder, a member of the medical staff, "Well, why don't you take his privileges away?" Upon seeing Dr. Keagy, the two ceased their conversation. (Exhibit M to plaintiff's opposition brief). Plaintiff concludes that they were speaking about him since he was the only physician during the relevant time period to be suspended. We disagree. The physician was not identified and they may have been discussing a doctor against whom proceedings were never brought.

Other arguments made by the plaintiff are not supported by the record. Plaintiff contends that Dr. Mitrick's influence upon Dr. Lasky is shown by Dr. Lasky's decision to suspend him after Dr. Mitrick told him that a complication Dr. Stitzell encountered in a recent surgery was rare. To the contrary, Dr. Lasky suspended the plaintiff after consultation with other doctors led him to conclude that, while the complication was not rare, Dr. Stitzell should have known that it might occur but did not know to expect it or how to handle it. Thus, this incident, rather than showing how much Dr. Lasky was influenced by Dr. Mitrick, illustrates the opposite.

Additionally, there are no sharp contradictions in Dr. Lasky's testimony which would support an inference of complicity. Dr. Lasky did not contradict Dr. Mitrick's testimony by "consistently deny[ing] that Mitrick ever complained about Stitzell," pri-

or to the suspension, as plaintiff asserts. (plaintiff's opposition brief at p. 20). There was no specific reference to Dr. Mitrick in the portion of Dr. Lasky's deposition cited by plaintiff, only that Dr. Lasky did not mention that Dr. Mitrick had complained to him about Dr. Stitzell immediately prior to the suspension. (Lasky deposition at p. 31). This does contradict Dr. Mitrick's own testimony but we do not consider it sufficiently probative to affect our disposition of the motion. Dr. Lasky did specifically testify later that he had no contact with Dr. Mitrick but he was referring to the time period after the suspension went into effect. (Lasky deposition at p. 40).

Finally, we would note the plaintiff's misinterpretation of Dr. McGraw's deposition. In an attempt to show the arbitrariness of the final decision of the Board of Directors in imposing an additional twelve months of monitoring, plaintiff points out that Dr. McGraw, Chairman of the Credentials Committee, believed that monitoring was still appropriate because plaintiff could not get along with internal medicine although Dr. McGraw could not back this up with personal observation or other evidence. But Dr. McGraw made it clear that this was only his own opinion and he had never expressed it to the Committee. He also never said that he had communicated this to the Board. To the contrary, the opinion he did state to the Board was that the monitoring program should continue because of the small number of operations performed at Memorial. (McGraw deposition at p. 51–57, Exhibit P to plaintiff's opposition brief). McGraw's opinion is not relevant to the issues in this case.

We turn now to the breach of contract claim in count II of the complaint.

■ Count II alleges that Memorial breached the monitoring agreement by failing to reinstate plaintiff after he successfully completed the monitoring program. Defendants contend that there was no breach because the Hospital had the unconditional right under the agreement to extend the monitoring period for as long as it wanted.

**1070**

The agreement has no express provision setting its maximum duration. In the absence of such a provision, Pennsylvania would look to the intention of the parties in that regard as evidenced "from the surrounding circumstances and by the application of a reasonable construction to the agreement as a whole." *Von Lange v. Morrison–Knudsen Co., Inc.*, 460 F.Supp. 643, 649 (M.D.Pa.1978) (interpreting Pennsylvania law). Applying this standard, we believe that plaintiff has correctly asserted that the monitoring program was to last as long as necessary to evaluate his skills. Accordingly, we reject the defendants' position that the agreement conferred upon Memorial the unfettered right to impose the monitoring requirement for as long as it saw fit.

The difficulty for the plaintiff is that we see nothing in the record to indicate that Memorial acted in less than good faith in imposing the additional year of monitoring. That decision may have been objectively wrong as a matter of its rights under the contract but the exculpatory clause would shield that error from judicial oversight. As noted above, the purpose of the clause was to protect the Hospital in decisions it made on physician competency. In the absence of bad faith, the length of the monitoring program Memorial felt would be appropriate to ensure patient safety would be one of those matters. The record reflects that decision was made out of concern for patient safety and plaintiff's claim in count II must fail.

We will issue an appropriate order.