Sarah WEINSTEIN

v.

Richard BULLICK and CBS, Inc. d/b/a WCAU–TV.

Civ. A. No. 92–5127.

United States District Court, E.D. Pennsylvania.

June 15, 1993.

Joe H. Tucker, Jr., Martina Walsh McLaughlin, Litvin, Blumberg, Matusow & Young, Philadelphia, PA, for plaintiff.

Lek Domni, Paula S. Silverstein, Asst. City Sols., Philadelphia, PA, for Richard Bullick.

Jeffrey D. Kahn, Schnader, Harrison, Segal & Lewis, Carl A. Solano, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Douglas P. Jacobs, Douglas P. Jacobs, Esq., Madeleine Schachter, New York City, for CBS, Inc.

## MEMORANDUM

GILES, District Judge.

Plaintiff brings claims against defendants for defamation, invasion of privacy, and intentional infliction of emotional distress. Jurisdiction is based upon diversity of citizenship and the case is governed by Pennsylvania law. Defendants have filed motions for summary judgment. For the reasons stated below, both motions are granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The complaint alleges that Sarah Weinstein ("Weinstein") was abducted in November 1991 from a street in the City of Philadelphia by an unknown assailant who thereafter sexually assaulted her. Following her release by her abductor, plaintiff complained to the Philadelphia Police Department, giving officers of the Sex Crimes Unit a detailed description of the assault in a recorded interview.

Richard Bullick ("Bullick") was commanding officer of the Sex Crimes Unit at the time of the above described events. In an on-camera interview with reporters from WCAU–TV, Bullick made statements which Weinstein alleges defamed her. She further alleges that Bullick knew that his statements were improper, erroneous, misleading, untrue and defamatory. WCAU–TV broadcasted Bullick's remarks throughout the Philadelphia area on its evening news program.

Weinstein alleges that Bullick's statements were broadcast by WCAU in spite of the fact that WCAU knew or should have known that the information contained in the broadcast was erroneous, misleading, untrue, and defamatory.

Based upon the above-described allegations, Weinstein brought the instant action against Bullick and WCAU, claiming defamation, *see* Complaint Count I, invasion of privacy by casting her in a false light, *see* Count II, and intentional infliction of emotional distress, *see* Count III. Defendants have moved to dismiss the complaint, or in the alternative, for summary judgment. In an Order dated February 8, 1993, the court informed the parties that it would consider defendants' motions to be for summary judgment, and gave plaintiff time to file additional evidence in opposition to defendants' motions. *See* Fed.R.Civ.P. 12(b) (if matters outside the pleading are submitted with 12(b)(6) motion, the motion shall be treated as Rule 56 motion, and parties given reasonable opportunity to present pertinent material). Weinstein filed several additional evidentiary items, and we now consider the motions.

## II. STANDARD FOR SUMMARY JUDGMENT

▮ Summary judgment is to be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Where, as here, the non-moving party has the burden of proof at trial, the movant need not produce evidence negating the non-movant's case. Instead, the moving party need only demonstrate that there is a lack of any evidence to support the non-movant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). Once the movant satisfies this initial burden, the non-movant cannot rest solely upon the allegations of her pleadings. Fed.R.Civ.P. 56(e). Instead, she must demonstrate that there is sufficient evidence for a jury to return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.,* 477 U.S. at 251–52, 106 S.Ct. at 2512. With these general considerations in mind, we will examine each count of the complaint.

## III. DEFAMATION

▮ Under Pennsylvania law, a plaintiff in a defamation action has the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff. 42 Pa.C.S. § 8343(a); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923 (3d Cir. 1990), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Restatement (Second) of Torts* § 613. Defendants argue that the statements by Bullick were not defamatory because they were merely expressions of opinion. Defendants also assert that, even if the statements were defamatory, plaintiff cannot establish that they applied to her. Because there is a genuine issue of material fact with respect to each of these contentions, the motions for summary judgment on the defamation claim will be denied.

### A. The Defamatory Character of the Publication

▮ The threshold question in a defamation action is whether the publication is capable of defamatory meaning. Whether a broadcast can be understood as defamatory is for the court to decide. *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 402 (1987); *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 270 (3d Cir.1980); *Corabi v. Curtis Pub. Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971); *Restatement (Second) of Torts* § 614(1). If the court determines that a statement could be construed as defamatory, it is for the jury to determine if it was so understood by the recipient. *Corabi,* 441 Pa. at 442, 273 A.2d at 904; *Redco Corp. v. CBS,*

*Inc.,* 758 F.2d 970, 971 (3d Cir.1985), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 107 (1985); *Restatement (Second) of Torts* § 614(2).

■ "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Corabi,* 441 Pa. at 442, 273 A.2d at 904 (quoting *Cosgrove Studio & Camera Shop, Inc. v. Pane,* 408 Pa. 314, 318, 182 A.2d 751, 753 (1962)); *accord, Steaks Unlimited,* 623 F.2d at 270; *Restatement (Second) of Torts* § 559. In determining whether a statement is capable of defamatory meaning, the court must look to "the effect that it is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." *Baker,* 516 Pa. at 296, 532 A.2d at 402; *accord Corabi,* 441 Pa. at 447, 273 A.2d at 906–07. The allegedly defamatory statement must be reviewed in the context of the entire broadcast. *Pierce v. Capital Cities Communications, Inc.* 576 F.2d 495, 502 (3d Cir.1978), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Corabi,* 441 Pa. at 444–45, 273 A.2d at 906; *Restatement (Second) of Torts* § 563, Comment d. "The words must be given by judges and juries the same signification that other people are likely to attribute to them." *Corabi,* 441 Pa. at 447, 273 A.2d at 907.

Defendants argue that Bullick's statements are not capable of defamatory meaning because they are merely expressions of opinion. It is true that "opinion without more does not create a cause of action in libel." *Baker,* 516 Pa. at 297, 532 A.2d at 402; *accord Restatement (Second) of Torts* § 566. The protection of "pure" opinion has a Constitutional basis:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). However, this does not mean that there is "a wholesale defamation exception for anything that might be labeled 'opinion.' ... [E]xpressions of 'opinion' may often imply an assertion of objective fact." *Petula v. Mellody,* 138 Pa.Commw. 411, 588 A.2d 103, 108 (1991) (quoting *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)).

■ Because "expressions of 'opinion' may often imply an assertion of objective [defamatory] fact," statements of opinion are actionable if the allegedly libeled party can "demonstrate that the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Baker,* 516 Pa. at 297, 532 A.2d at 402; *accord, Restatement (Second) of Torts* § 566. The rationale behind this rule has been succinctly explained by the third circuit:

[A]n opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*Redco,* 758 F.2d at 972.

With these general considerations in mind, we examine the content of the allegedly defamatory broadcast. It is undisputed that the following is the transcript of the November 7, 1991 broadcast in its entirety:

**Jane Robelot:**[1] And tonight authorities are investigating a complicated case of abduction and rape that allegedly occurred last Friday. Channel 10 News reporter Andrew Glassman has learned that while the Philadelphia Sex Crimes Division is actively investigating the case, some say they have reservations.

**Andrew Glassman:** The Bryn Mawr student told police a man forced his way into

---

1. Jane Robelot is an "anchorperson" for WCAU– TV's Channel 10 news broadcast.

her car outside a party at the University of Pennsylvania, pulled what appeared to be a gun, forced her to take off her clothes and· have sex with him while he drove across the Walt Whitman Bridge, then stopped the car and raped her again. The woman had a plan: she told her attacker she'd bring him back here—to her dorm room at Bryn Mawr College. She said she'd get her instant teller card and get him cash. She was trying to lure him to a public place to get someone's attention—an officer or a security guard. But even after all that, she couldn't find anyone to help her out. Bryn Mawr Public Safety Chief Steven Heath was sorry his officers were not able to respond.

**Steven Heath:** There is a bright side of this whole tragic event is the fact that the victim really used her head. There could have been a textbook response to such a concern. She most certainly used it.

**Andrew Glassman:** But this was the reaction today from Captain Richard Bullick, Sex Crimes Division of the Philadelphia Police. He is investigating this case.

**Richard Bullick:** She's saying a lot of things that went on in the car—she's driving—she's driving 80 miles an hour having sex with the guy—in a little Nissan. I couldn't do it, maybe she could. I don't know. And even if there was sex, that doesn't mean it was forcible sex. So it's all of these things we have to look into before we come to a conclusion. But, you know, I'm skeptical at the beginning of the investigation.

**Andrew Glassman:** You're skeptical at the beginning of *this* investigation? Or?

**Richard Bullick:** Both. As we are now, I'm a little skeptical about it. But until we get—

**Andrew Glassman:** Captain Bullick later phoned us to say he knew we were recording him but was uncomfortable with what

he had said. He said he did not wish to appear insensitive to the alleged victim. This was his official statement on the case:

**Richard Bullick:** It's a very sensitive investigation as they all are. And we handle it just as we handle every other investigation that until it's proven to be factual or non-factual, we handle it as if it is factual.

**Andrew Glassman:** A source at Bryn Mawr College in contact with the alleged victim told us late tonight that she would be devastated if she heard that Philadelphia police did not believe her story. Officially the police department continues to seek this man in connection with the incident and Bullick says, he plans to interview the alleged victim again tomorrow. Andrew Glassman, Channel 10 News.

Transcript of November 7, 1991 Broadcast, attached as Exhibit "1" to Motion of Defendant CBS Inc. to Dismiss the Complaint, or, in the Alternative, for Summary Judgment ("Broadcast Tr.").[2]

Read in the light most favorable to the plaintiff, Bullick's statements are at least expressions of skepticism about the truthfulness of plaintiff's account of the alleged abduction and rape. While his comments may be interpreted reasonably as an expression of opinion, the content and context of the broadcast allow a reasonable listener to conclude that Bullick's skeptical opinion is based upon undisclosed defamatory facts.

Bullick's comment that the plaintiff said "a lot of things that went on in the car," could reasonably lead a listener to believe that his skepticism about plaintiff's story was based upon more facts than those relayed in the rest of his statement or even in the rest of the broadcast as a whole. A listener to the broadcast could reasonably conclude that the police officer in charge of investigating an alleged abduction and rape knew much more about the case than the limited facts revealed in a television news broadcast. *See Malia v.*

---

**2.** It is apparent from the above-reproduced transcript, and from the allegations of the Complaint, that Bullick made two separate statements to television reporters. Bullick does not contend that his statements were taken out of context or distorted in any way. We assume that the transcript accurately reflects the content and context of his remarks. The second statement made by

Bullick may be interpreted as a retraction of the first, However, retraction of a defamatory statement relates only to mitigation of damages, and not to defendant's malice at the time of the defamation. *Matus v. Triangle Publications, Inc.,* 57 Del.Co. 21 (1969), *aff'd,* 445 Pa. 384, 286 A.2d 357 (1972), *cert. denied,* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972).

*Monchak,* 116 Pa.Commw. 484, 543 A.2d 184, 191 (1988) (reasonable for listener to infer that defendant's statement of opinion about plaintiff's job performance was based upon undisclosed defamatory facts, when statement was made after nonpublic meetings in which plaintiff's job performance was discussed).

Thus, a reasonable listener could conclude that Bullick's statements of opinion imply the existence of undisclosed facts indicating that plaintiff engaged in consensual sexual intercourse with a stranger while driving at high speed, and then fabricated a story of abduction and rape for the police. Accordingly, we find that the broadcast is capable of a defamatory meaning. Therefore, there exists an issue of material fact as to whether the broadcast was understood by its recipients as defamatory. Summary judgment on this issue must be denied.

B. *Application of the Defamatory State-ments to the Plaintiff: the "of and concerning" requirement*

Defendants argue that Weinstein cannot establish the application of the allegedly defamatory statements to her, that is, the broadcast was not "of and concerning" her, and, therefore, her defamation claim fails as a matter of law. The court disagrees.

■ It is undisputed that plaintiff was not named in the allegedly defamatory broadcast. However, a defamed party need not be specifically named in a defamatory statement in order to recover, if she is pointed to by description or circumstances tending to identify her. *Redco,* 758 F.2d at 972; *Cosgrove Studio & Camera Shop, Inc. v. Pane,* 408 Pa. 314, 319, 182 A.2d 751, 753 (1962); *Restatement (Second) of Torts* § 564, Comment b. When the plaintiff is not named in the broadcast, the court must determine if a viewer could reasonably conclude that the broadcast referred to the plaintiff. If the court decides in the affirmative, the jury must determine if the recipient actually concluded that the defamatory matter referred to the plaintiff. *Farrell v. Triangle Publications, Inc.,* 399 Pa. 102, 109–110, 159 A.2d 734, 739 (1960).

The broadcast contains numerous details that would help a viewer identify the subject of the allegedly defamatory statements. The subject of the broadcast is identified as a female Bryn Mawr student who was the reported victim of a rape on a certain day. Some of the unusual details of the abduction leading to the rape are given. The victim is said to live in a dorm at Bryn Mawr College, to drive a Nissan, and to have attended a party at the University of Pennsylvania shortly before her abduction. *See* Broadcast Tr. All of these things are the types of "description of or reference to" the plaintiff that could lead those who saw the broadcast to "reasonably understand the plaintiff to be the person intended." *Restatement (Second) of Torts* § 564, Comment b.

The possibility that plaintiff would be identified by a viewer as the subject of the broadcast is heightened when we consider evidence submitted by defendants that Bryn Mawr is a small school, with approximately 1,200 undergraduate students and 550 graduate students. Motion of Defendant CBS Inc. to Dismiss the Complaint, or, in the Alternative, for Summary Judgment, Exhibit 2 at 8. The defendants' own submission also indicates that "Bryn Mawr's size allows its students and faculty to work closely together and to know each other well." *Id.* at 3. In this type of environment, it would not be surprising if some people could identify plaintiff from the information supplied in the broadcast.

Of course, we are not free to base our decision on speculation that someone *might* have identified plaintiff as the subject of the broadcast. Because the applicability of the defamatory matter to Weinstein depends upon extrinsic circumstances, rather than upon her being identified by name, the evidence must be able to support a conclusion that some person who saw the broadcast was familiar with the circumstances and reasonably believed that the broadcast referred to plaintiff. *Restatement (Second) of Torts* § 564, Comment b. The court is satisfied that the evidence submitted by the parties does support such a conclusion.

Weinstein has submitted affidavits from two Bryn Mawr students stating that "news

of Sarah Weinstein's rape spread quickly across the campus." Affidavits of Bonnie Shinkle and Judy Kellem, attached as Exhibits A & B to Plaintiff's Memorandum in Support of Additional Evidence. The affiants further declare that when the broadcast was "aired lots of people on campus were talking about it." *Id.* Read in the light most favorable to the plaintiff, these affidavits indicate that many Bryn Mawr students, faculty and staff knew that a rape had allegedly occurred, could identify plaintiff as the alleged victim of the rape, and could reasonably have identified her as the subject of the broadcast.[3]

Defendants argue that the affiants' assertion that "lots of people" knew about the rape is premised upon hearsay, and therefore not admissible as part of plaintiff's opposition to summary judgment. *See* CBS's Response to Additional Evidence at 3 (citing *Hotel & Restaurant Employees' Alliance v. Allegheny Hotel Co.,* 374 F.Supp. 1259, 1263 (W.D.Pa.1974)). It is true that a court considering a motion for summary judgment has discretion to disregard those facts which would not be admissible in evidence and to rely upon only facts that would be admissible. *See, e.g.,* 10 *Wright & Miller, Federal Practice and Procedure* §§ 2721–24. While Rule 56(e) states that an affidavit in opposition to a motion for summary judgment "shall set forth such facts as would be admissible in evidence," "[t]his requirement, however, has been interpreted in a lenient fashion." *United States v. Price,* 577 F.Supp. 1103, 1116 n. 13 (D.N.J.1983) (citing *Corley v. Life & Casualty Insurance Co.,* 296 F.2d 449, 450 (D.C.Cir.1961)).

In *Corley,* the Court of Appeals for the District of Columbia Circuit was asked to disregard an affidavit submitted in opposition to a summary judgment motion, because the affidavit contained statements which were arguably hearsay. The court declined to ignore the affidavit, explaining:

Admissibility of testimony sometimes depends upon the form in which it is offered, the background which is laid for it, and perhaps on other factors as well.

It is therefore possible ... that [the alleged hearsay] will be admissible [at trial].... [T]his is sufficient to defeat the motion for summary judgment, because courts are inclined to hold the movant to a strict demonstration that no genuine issue exists.

*Corley,* 296 F.2d at 450; *accord, Price,* 577 F.Supp. at 1116 n. 13; *Multi–Tech Systems, Inc. v. Hayes Microcomputer Products, Inc.,* 800 F.Supp. 825, 844–455 (D.Minn.1992) (refusing to ignore non-movant's evidence on grounds of lack of foundation, lack of authentication, hearsay, best evidence rule, or incompleteness); *Reed v. Ford Motor Co.,* 679 F.Supp. 873, 874–75 (S.D.Ind.1988) (refusing to strike non-movant's evidence on grounds of hearsay, irrelevance, or undue prejudice). We would be particularly hesitant to ignore hearsay-based evidence in plaintiff's affidavits at this stage of the proceedings, when discovery is still open and hearsay evidence might well lead to the discovery of evidence which is admissible at trial. *See, e.g., Price,* 577 F.Supp. at 1116–17 (refusing to ignore hearsay in affidavit presented by non-moving party when discovery was ongoing, and granting more time for discovery); *Western Land Corp. v. Crawford–Merz Co.,* 62 F.R.D. 550, 555 (D.Minn.1973) (if non-movant's evidence would be inadmissible at trial, but indicates that non-movant could offer admissible evidence at trial sufficient to create genuine issue of material fact, summary judgment should be avoided); *Shinabarger v. United Aircraft Corp.,* 262 F.Supp. 52, 56 n. 3 (D.Conn.1966) (unsworn statement should alert the court to the possible availability at trial of the facts contained in the statement), *aff'd in part and rev'd in part on other grounds,* 381 F.2d 808 (2d Cir.1967). Therefore, the court will consider affidavit claims that knowledge of plaintiff's abduction and rape was widespread on Bryn Mawr's campus.

---

**3.** It·is immaterial that the group of listeners who might reasonably have identified plaintiff from the broadcast may be limited to members of the Bryn Mawr community. For "[i]t is not necessary that everyone recognize the other as the person intended; it is enough that any recipient of the communication reasonably so understands it." *Restatement (Second) of Torts* § 564, Comment b.

Even if we were to ignore those portions of the affidavits which are arguably based upon hearsay, the affidavits show that the affiants had personal knowledge that could have led them to conclude reasonably that the broadcast was of and concerning plaintiff. The affidavits state that shortly after the alleged abduction and rape Weinstein told affiants about her ordeal. Shinkle Aff., Kellem Aff., *supra*. As a result, each of these Bryn Mawr students has sworn that "[e]ven though her name was never mentioned, I knew that the broadcast was about [plaintiff]." *Id.* Because the information given in the broadcast was sufficient to make the affiants' association of the broadcast with plaintiff a reasonable one, plaintiff's evidence is sufficient to withstand defendants' motions for summary judgment as to the "of and concerning" requirement.

Defendants argue that affiants' claims that they knew the broadcast was about plaintiff have no probative value since "the affiants cannot even purport to have known that each and every other female student attending Bryn Mawr ... was *not* the victim of a rape." Response of Defendant CBS Inc. to Plaintiff's Memorandum in Support of Additional Evidence at 3 (emphasis in original).

Plaintiff need only prove that viewers of the broadcast identified her as its subject, and that the identification was reasonable. As described above, plaintiff has submitted evidence sufficient for a jury to find that at least two people identified her as the subject of the broadcast. The court must conclude, based upon the identifying information given in the broadcast, that the affiants' identification of plaintiff was reasonable. *See Restatement (Second) of Torts* § 564 Comment b (if communication is reasonably understood by person to whom it is made as intended to refer to plaintiff, it is not decisive that the defamer did not intend to refer to her).

Defendants also seize upon evidence that plaintiff told others that she had been the victim of a rape. Defendants argue that the source of information about the identity of the alleged victim came not from the Broadcast, but from Weinstein herself. Far from supporting Weinstein's claim, the Affidavits suggest that, had *Weinstein* not disclosed information about her alleged assault, neither affiant could even purport to discern the identity of the putative victim referred to in the Broadcast. Without the benefit of extrinsic facts—which the plaintiff herself voluntarily chose to impart, reasonable viewers of the Broadcast could not have known that Weinstein was the putative victim from the sparse identifying details disclosed by CBS.

Response of Defendant CBS Inc. to Plaintiff's Memorandum in Support of Additional Evidence at 2 (emphasis in original). Defendants ask the court to find that the broadcast was not of and concerning plaintiff because viewers could identify plaintiff only on the basis of knowledge given by her to them.

Defendants' argument is fatally flawed in two ways. First, defendants' argument improperly reads the evidentiary submission as asserting that all who may have identified plaintiff from the broadcast did so only because of her own disclosure that she was the victim. In considering a motion for summary judgment, all reasonable inferences from the evidence must be made in favor of the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Here, the affidavits can reasonably be read to assert that many people on campus identified plaintiff as the subject of the broadcast, but are silent as to the means by which others than the affiants came to recognize her. We cannot make an inference detrimental to plaintiff's case when a favorable inference is also possible.

In addition, and more fundamentally, defendants' argument confuses nondefamatory information to the effect that one was a rape victim with defamatory information to the effect that one has lied to the police and made up false claims of abduction and sexual abuse. Under defendants' rationale, had plaintiff announced to the entire campus that she had been abducted and raped she could not sue for defamation if later someone announced that the woman who claimed she was raped was a liar. Where a plaintiff has announced certain *non-defamatory* facts about herself, which later assist a reasonable recipient of *defamatory* remarks in identify-

ing their subject, it is irrelevant that those non-defamatory facts came from her mouth.

Defendants cite *Garvey v. Dickinson College*, 761 F.Supp. 1175 (M.D.Pa.1991) for the proposition that the court should not speculate that plaintiff could be identified as the subject of the broadcast because "academia is a small world." However, we are not asked to speculate in the instant case. We have been offered *evidence* indicating that Bryn Mawr "is a small world," that students at Bryn Mawr identified plaintiff as the subject of the allegedly defamatory broadcast, and that the identification was reasonable. The court finds on this record that a listener to the broadcast could reasonably conclude that plaintiff was its subject. In addition, plaintiff's submissions create a genuine issue of material fact as to whether some listeners actually did conclude that the broadcast referred to her. Therefore, summary judgment is not appropriate.

## IV. INVASION OF PRIVACY

Defendants also move for summary judgment as to Count II of the complaint, which alleges that defendants invaded plaintiff's privacy by casting her in a false light highly offensive and objectionable to a reasonable person. Our analysis and conclusions regarding plaintiff's defamation claim are also dispositive of the invasion of privacy claim.

Pennsylvania courts have adopted the *Restatement* definition of "false light" invasion of privacy. *Vogel v. W.T. Grant Co.*, 458 Pa. 124, 129, 327 A.2d 133, 136 (1974); *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa.Super. 66, 543 A.2d 1181, 1188 (1988); *Martin v. Municipal Publications*, 510 F.Supp. 255, 259 (E.D.Pa.1981).[4] As defined by the *Restatement*:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Restatement (Second) of Torts* § 652E.

■ The "false light" tort differs from a claim of defamation in at least two respects: publicity (i.e. widespread dissemination) is required, rather than mere publication; and the false statement or imputation need not be defamatory. *Bromhall v. Rorvik*, 478 F.Supp. 361, 367 (E.D.Pa.1979); *Restatement (Second) of Torts* § 652E, Comments a & b, § 652D, Comment a. However, false light invasion of privacy "is closely allied to the law of defamation," and as a result courts have applied to false light claims some of the same considerations that govern defamation actions. *Fogel v. Forbes, Inc.*, 500 F.Supp. 1081, 1088 (E.D.Pa.1980); *see also Restatement (Second) of Torts* § 652E, Comment e.

■ Defendants' opposition to plaintiff's false light claim is identical to an objection raised as to the defamation claim. They argue that the claim must be dismissed because Bullick's statements were not "of and concerning" plaintiff. We agree that defamation law's "of and concerning" requirement should be applied to false light invasion of privacy claims. An element of a false light claim is that the defendant gives " 'publicity to a matter concerning another that places the other in a false light.' ... This would require that the publicity forming the basis for the false light claim be reasonably capable of being understood as singling out, or pointing to, the plaintiff." *Michigan United Conservation Clubs v. CBS News*, 485 F.Supp. 893, 904 (W.D.Mich.1980) (quoting *Restatement (Second) of Torts* § 652E), *aff'd*, 665 F.2d 110 (6th Cir.1981). *See also, Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir.1983). However, as we have already explained, *see supra* Section III.B, a jury could

---

4. The tort of "invasion of privacy is actually comprised of four analytically distinct torts: 1) intrusion upon seclusion, 2) appropriation of name or likeness, 3) publicity given to private life, and 4) publicity placing a person in false light." *Marks v. Bell Telephone Co.*, 460 Pa. 73, 85–86, 331 A.2d 424, 430 (1975) (citing *Vogel, supra; Restatement (Second) of Torts* § 652A–J Tent.Draft No. 13, 1967); W. Prosser, *Handbook of the Law of Torts* § 117, at 804 (4th ed. 1971).

reasonably conclude that the broadcast referred to plaintiff. Therefore, defendants' motions for summary judgment must be denied as to plaintiff's false light claim.[5]

## V. INTENTIONAL INFLICTION · OF EMOTIONAL DISTRESS

Count III of the Complaint attempts to state claims for the tort of intentional infliction of emotional distress as defined in the *Restatement:*

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and, if bodily harm to the other results from it, for such bodily harm.

*Restatement (Second) of Torts* § 46 (1965). The Pennsylvania Supreme Court has repeatedly applied the *Restatement* definition to claims for intentional infliction of emotional distress. *See, e.g., Kazatsky v. King David Memorial Park, Inc.,* 515 Pa. 183, 527 A.2d 988, 991–95 (1987); *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 511 n. 8, 431 A.2d 966, 971–72 n. 8 (1981). However, the court has also repeatedly found that the facts presented did not constitute the tort. *See, e.g., Kazatsky,* 515 Pa. at 197–99, 527 A.2d at 995 (plaintiffs' recovery barred by their failure to present competent medical evidence of alleged emotional distress); *D'Ambrosio,* 494 Pa. at 509–13 n. 8, 431 A.2d at 971–72 n. 8 (defendant's behavior was not "extreme and outrageous" as required by § 46); *but see, Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970) (allowing recovery for serious emotional distress directly caused by the intentional and wanton acts of mishandling a decedent's body).

■ In *Kazatsky,* the Pennsylvania Supreme Court complained that "[v]arious other courts have incorrectly taken the view that this Court has adopted section 46," 515 Pa. at 183–87 n. 1, 527 A.2d at 988–89 n. 1 (citing *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir.1979); *Banyas v. Lower Bucks Hospital,* 293 Pa.Super. 122, 437 A.2d 1236 (1981)), and left "to another day the question of the viability of section 46 in this Commonwealth." *Kazatsky,* 515 Pa. at 185, 527 A.2d at 989. At least one Pennsylvania Superior Court decision has concluded that "*Kazatsky* makes clear that the tort of intentional infliction of emotional distress is not recognized in Pennsylvania." *Ford v. Isdaner,* 374 Pa.Super. 40, 542 A.2d 137, 139 (1988), *app. denied,* 520 Pa. 617, 554 A.2d 509 (1988). However, the third circuit has confronted this question since *Kazatsky* was decided, and has repeatedly held that Pennsylvania does recognize the tort, in spite of "speculation" to the contrary raised by *Kazatsky. Silver v. Mendel,* 894 F.2d 598, 606 (3d Cir.1990), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *accord, Clark v. Falls,* 890 F.2d 611, 623 (3d Cir. 1989); *Williams v. Guzzardi,* 875 F.2d 46, 51 (3d Cir.1989). Accordingly, we find that the tort of intentional infliction of emotional distress, as defined by the *Restatement,* is recognized in Pennsylvania.

■ The *Restatement* definition has been broken down into four elements by the third circuit: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe. *Williams,* 875 F.2d at 52; *Chuy,* 595 F.2d at 1273. Defendants challenge plaintiff's ability to establish the first element of the claim.

The third circuit has recognized the "difficulty of providing a precise definition of 'outrageous' conduct." *Williams,* 875 F.2d at 51 n. 10. The *Restatement* describes the type of conduct which is envisioned by § 46 to be "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "mal-

**5.** Although the issue was not explicitly raised by defendants, our conclusion that Bullick's statement is "reasonably capable of defamatory meaning," *see supra* Section III.A, also convinces us that a jury could reasonably find that the broadcast cast plaintiff in a "false light ... which ... would be highly offensive to a reasonable person." *Restatement (Second) of Torts* § 652E(a). *See Fogel,* 500 F.Supp. at 1088.

ice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Restatement (Second) of Torts* § 46, Comment d; *accord, Silver,* 894 F.2d at 606 n. 17; *Kazatsky,* 515 Pa. at 189–91, 527 A.2d at 991.

Pennsylvania courts have been "chary to declare conduct 'outrageous,'" *Cox v. Keystone Carbon,* 861 F.2d 390, 395 (3d Cir. 1988); *Clark,* 890 F.2d at 623, and "have been cautious in permitting recovery for intentional infliction of severe emotional distress." *Williams,* 875 F.2d at 52; *accord, Silver,* 894 F.2d at 606. The complained of conduct must be "both extreme and very offensive to the moral values of society," *Silver,* 894 F.2d at 606, and recovery has been allowed "only in limited circumstances where the conduct has been clearly outrageous." *Cox,* 861 F.2d at 395 (citation omitted). *See, e.g., Chuy* (recovery allowed when team doctor told reporter that member of team suffered from fatal blood disorder though knowing it to be untrue); *Papieves,* (recovery allowed against hit and run driver who, without attempting to obtain medical assistance and without notifying police or parents, removed child's body from scene of accident and buried it in a field).

 Viewed against this stringent standard, Bullick's conduct does not rise to the "extreme and outrageous" level necessary to support a claim of intentional infliction of emotional distress in Pennsylvania. For example, in *Clark v. Falls, supra,* defendants, who were a township chief of police and a member of the township's board of supervisors, did much more than merely accuse the plaintiff of engaging in illegal or immoral activity. The defendants engaged in a sustained campaign against the plaintiff in which they showed disparaging reports about him to the public, changed his job duties and deprived him of privileges, confirmed to the public that he was being investigated, and forwarded charges against him to the Dis-

trict Attorney. The third circuit held that "[t]hese acts, while deplorable, do not constitute extreme and outrageous conduct as Pennsylvania has defined those terms." *Id.,* 890 F.2d at 624. With the facts of *Clark* as guidance, we find that the claim of intentional infliction of emotional distress against Bullick must be dismissed.

 The intentional infliction of emotional distress claim against WCAU–TV requires more analysis. According to the *Restatement:*

The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

*Restatement (Second) of Torts* § 46, Comment f. Weinstein argues that even if Bullick's conduct was not extreme and outrageous, WCAU–TV should be held liable because it knew that she was peculiarly susceptible to emotional distress and yet proceeded to broadcast comments which it knew would cause such distress.

In support of her argument, plaintiff has submitted an affidavit from an attorney whose law firm represents Bryn Mawr College saying that he "informed WCAU personnel that Bryn Mawr College officials were concerned about the story because the student who was abducted, assaulted and raped would be terribly upset by the broadcast of Officer Richard Bullick's interview." Affidavit of Kenneth M. Jarin at ¶ 3, attached as Exhibit "C" to Plaintiff's Memorandum in Support of Additional Evidence. In the broadcast, WCAU–TV reporter Andrew Glassman noted that "[a] source at Bryn Mawr College in contact with the alleged victim told us late tonight that she would be

devastated if she heard that Philadelphia police did not believe her story." Broadcast Tr. Plaintiff argues that this evidence shows WCAU–TV knew that the broadcast would cause her emotional distress and proceeded to air it anyway. She concludes that even if Bullick's comments were not extreme and outrageous under Pennsylvania law, the broadcast of those comments was extreme and outrageous because WCAU–TV had prior knowledge of her susceptibility to distress.

We disagree. Plaintiff's submissions do not show that WCAU–TV knew she was "peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Compare Restatement (Second) of Torts* § 46, Comment f, Illustrations 9–12 (mental conditions or peculiarities include mental deficiency, extreme superstition; physical conditions or peculiarities include pregnancy, heart illness). Instead, they indicate at most that WCAU–TV knew that plaintiff would be upset by the broadcast. The mere fact that WCAU–TV was informed beforehand that plaintiff would be upset by the broadcast is insufficient to make the broadcast extreme and outrageous when it would not otherwise be so. The *Restatement* definition always restricts the tort to situations "where the actor desires to inflict emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct." *Id.* § 46, Comment i. To allow the defendant's knowledge that its actions will upset the plaintiff to trigger the lower standard for "extreme and outrageous" behavior envisioned in Comment f would allow the exception described in Comment f to swallow the rule of § 46.

WCAU–TV's broadcast presents comments from Bryn Mawr's Public Safety Chief which are sympathetic to plaintiff. He opined that plaintiff "really used her head" in response to the abduction, and praised her actions as "a textbook response" to a dangerous situation. Broadcast Tr. The WCAU–TV reporter's remark that plaintiff "would be devastated if she heard that Philadelphia police did not believe her story," *id.*, could be reasonably understood as a report that plaintiff insists that her story is true. Because Bullick's statements are not extreme and outrageous under Pennsylvania law, the broadcast taken as a whole, which includes Bullick's comments along with other material more sympathetic to plaintiff, cannot support a claim for intentional infliction of emotional distress as to WCAU–TV. Summary judgment is granted as to count III of the complaint.

## VI. DEFENDANT BULLICK'S IMMUNITY CLAIMS

Bullick argues that he is entitled to immunity from all of plaintiff's claims because his statements which led to this lawsuit were made while he was acting within the scope of his authority as Captain of the Philadelphia Police Department's Sex Crimes Unit. We agree that Bullick is immune from suit for negligent acts. However, he is not immune from suit for intentional torts. Because all of the tort claims asserted against Bullick include allegations that he acted intentionally, the complaint against him is not barred by official immunity.

The Political Subdivision Tort Claims Act, ("PSTCA"), 42 Pa.C.S. § 8541 *et seq.* provides a comprehensive statutory framework for analyzing official immunity claims by local governmental agencies and their employees. The general rule of the Act is that local agencies and their employees are immune from suit. 42 Pa.C.S. §§ 8541 & 8545. The only exceptions to this general grant of immunity are those which are specified in the Act. *Id.* These exceptions to the general rule of immunity are given in 42 Pa.C.S. §§ 8542 & 8550. Thus, Bullick is immune from any claim in the instant case unless that claim falls into one of the categories enumerated in § 8542 or § 8550.

Section 8542 of PSTCA permits recovery against a local agency or its employee for negligent acts only if the act falls into one of the following eight categories: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; (8) care, custody or control of animals. 42 Pa.C.S. § 8542(b). Because none of the claims against Bullick falls into one of these eight categories, to the extent that plaintiff's

claims are based in negligence they are barred by PSTCA. *See, e.g., Agresta v. Philadelphia,* 694 F.Supp. 117, 123 (E.D.Pa. 1988); *Buskirk v. Seiple* 560 F.Supp. 247, 251–52 (E.D.Pa.1983).

While PSTCA grants immunity from negligent acts except in the eight categories delineated above, the same broad immunity is not granted for intentional torts. Section 8550 of the Act provides:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

42 Pa.C.S. § 8550. This section strips local agency employees of immunity for acts which constitute crimes, actual fraud, actual malice, or willful misconduct. *Agresta,* 694 F.Supp. at 123–24; *LaPlant v. Frazier,* 564 F.Supp. 1095, 1098–99 (E.D.Pa.1983). "Willful misconduct, for the purposes of tort law, has been defined by [the Pennsylvania] Supreme Court to mean conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.... In other words, the term 'willful misconduct' is synonymous with the term 'intentional tort.'" *King v. Breach,* 115 Pa.Commw. 355, 540 A.2d 976, 981 (1988) (citing *Evans v. Philadelphia Transportation Co.,* 418 Pa. 567, 212 A.2d 440 (1965); W. Prosser, *Handbook of The Law of Torts* 31 (4th ed. 1971)); *accord, Agresta; LaPlant.*

The claims against Bullick are for defamation, invasion of privacy and intentional infliction of emotional distress. Each of these claims includes allegations that Bullick knew that his statements and opinions were improper, erroneous, misleading, untrue and defamatory. In other words, plaintiff alleges that Bullick engaged in intentionally tortious conduct as to all counts. If plaintiff can prove at trial that Bullick's allegedly tortious conduct was intentional, Bullick will be stripped of immunity by § 8550. Thus, there is a genuine issue of material fact which precludes the court from granting defendant summary judgment on the issue of official immunity.

 Despite the language of PSTCA, Bullick argues that he is absolutely immune from suit even for his intentional torts because he is a high public official and was acting within the scope of his authority when the allegedly defamatory statements were made. However, we conclude that the common law doctrine of absolute immunity for high public officials has been abrogated by PSTCA.[6]

The Pennsylvania Supreme Court has stated that "[i]n order to discharge his duties effectively, a public servant must be free to exercise his judgment unhampered by fear of unpredictable liability." *DuBree v. Commonwealth,* 481 Pa. 540, 544, 393 A.2d 293, 295 (1978). In order to protect "society's interest in the unfettered discharge of public business and in full public knowledge of the facts and conduct of such business," *Montgomery v. Philadelphia,* 392 Pa. 178, 140 A.2d 100, 103 (1958) (quoting Note, 20 U.Chi. L.Rev. 677, 679 (1953)), the Pennsylvania Supreme Court established a common law privilege, holding that certain public officials were absolutely immune from suit for defamatory statements made while they were acting within the scope of their authority. *See, e.g., Montgomery; Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892 (1952). The court later made it clear that the grant of absolute immunity was not limited to suits for defamation. *Jonnet v. Bodick,* 431 Pa. 59, 244 A.2d 751, 753 (1968).

---

6. The parties' have not discussed the effect of PSTCA on the common law doctrine of absolute immunity for high public officials. Instead, they dispute whether Bullick is a high public official, and whether he was acting within the scope of his authority. Because we hold that the common law absolute immunity for high public officials is abrogated by PSTCA, we need not decide if defendant is a high public official.

For a defendant to qualify for this absolute immunity from suit, the Pennsylvania Supreme Court requires that there be proof that (1) he is a "high public official," and (2) the allegedly defamatory statements were made while he was acting within the scope of his authority. *Montgomery*, 392 Pa. at 182–84, 140 A.2d at 103; *Matson*, 371 Pa. at 192–94, 88 A.2d at 895. Bullick argues that he satisfies both of these criteria, and is, therefore, absolutely immune from suit.

The common law doctrine of absolute immunity for high public officials was significantly modified in 1978 by the Pennsylvania Supreme Court from the form upon which defendant now relies. *See DuBree v. Commonwealth*, 481 Pa. 540, 393 A.2d 293 (1978). *See also, Wicks v. Milzoco Builders, Inc.*, 481 Pa. 554, 393 A.2d 300 (1978); *Lehnig v. Felton*, 481 Pa. 557, 393 A.2d 302 (1978); *Kenno v. Commonwealth, Dep't of State Police*, 481 Pa. 562, 393 A.2d 304 (1978). However, we need not discuss the effect of *DuBree* on immunity claims. Whatever common law immunities might otherwise be available to defendant have been abrogated by the plain language of PSTCA.

PSTCA explicitly recognizes the possibility that there may exist common law defenses of official immunity, and allows for the preservation of those defenses in some circumstances. The Act provides:

In any action brought against an employee of a local agency for damages on account of an injury to a person or property based upon claims arising from, or reasonably related to, the office or the performance of the duties of the employee, the employee may assert on his own behalf ... [d]efenses which are available at common law to the employee.

42 Pa.C.S. § 8546(1). If this section stood alone, it would seem to preserve any common law immunities that defendant might have, including the defense of official immunity as described by the Pennsylvania Supreme Court in *Montgomery* and modified in *Du-Bree*.

However, this section does not stand alone and cannot be read alone. The Act also provides:

In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of section[ ] ... 8546 (relating to defense of official immunity) ... shall not apply.

42 Pa.C.S. § 8550. Thus, the plain language of the act strips Bullick of any immunity he might have had under the common law for acts which "constitute[ ] a crime, actual fraud, actual malice or willful misconduct." As discussed above, this includes the intentional torts alleged in the complaint. Defendant is an employee of a local agency. Therefore, he lacks immunity for intentional torts. It is irrelevant that he might also be classified as a "high public official" for the purposes of common law immunity.

We acknowledge that this holding is contrary to one of the Pennsylvania Commonwealth Court in the only published opinion which has addressed this issue directly. *See Factor v. Goode*, 149 Pa.Commw. 81, 612 A.2d 591 (1992). In *Factor*, plaintiffs brought a defamation action against the Mayor of the City of Philadelphia and its Revenue Commissioner. The Commonwealth Court held that because the defendants were "high public officials" and were acting within the scope of their authority when the allegedly defamatory statements were made, they were absolutely immune from suit under *Montgomery*.[7]

---

7. The Commonwealth Court stated that "[i]t has long been the law in this Commonwealth that high public officials are exempted by the doctrine of absolute privilege from all civil suits for damages arising out of false defamatory statements and even from statements motivated by malice, provided the statements are made in the course of the scope of the high official's authority or within his or her jurisdiction." *Factor*, 149 Pa.

Commw. at 85, 612 A.2d at 593 (citing *Montgomery*; *Rok v. Flaherty*, 106 Pa.Commw. 570, 527 A.2d 211 (1987), *app. denied*, 517 Pa. 628, 538 A.2d 880 (1988)). The court did not discuss the impact of *DuBree* on this immunity, or even cite *DuBree*. *Rok* refers to *DuBree* only in passing. *See Rok*, 527 A.2d at 212 n. 2, 106 Pa.Commw. at 573 n. 2 ("This Court is cognizant that the scope of absolute immunity is evolving through statuto-

The plaintiffs in *Factor* argued that the absolute privilege of high public officials is abrogated by § 8550. The Commonwealth Court rejected this argument, asserting that

> review of those cases discussing Section 8550 reveals no instance in which it has been applied to defeat the absolute privilege of a high public official.... Rather, the language of Section 8550 expressly refers to "employees" and has been applied only in those cases regarding employees of local agencies.

*Factor,* 149 Pa.Commw. at 87, 612 A.2d at 594 (citing *McNeal v. City of Easton,* 143 Pa.Commw. 151, 598 A.2d 638 (1991); *Lancie v. Giles,* 132 Pa.Commw. 255, 572 A.2d 827 (1990); *Yakowicz v. McDermott,* 120 Pa. Commw. 479, 548 A.2d 1330 (1988), *app. denied,* 523 Pa. 644, 565 A.2d 1168 (1989); *Malia v. Monchak,* 116 Pa.Commw. 484, 543 A.2d 184 (1988); *Scott v. Willis,* 116 Pa. Commw. 327, 543 A.2d 165 (1988); *Keeler v. Everett Area School District,* 111 Pa. Commw. 297, 533 A.2d 836 (1987); *Acker v. Spangler,* 92 Pa.Commw. 616, 500 A.2d 206 (1985); *Morris v. Musser,* 84 Pa.Commw. 170, 478 A.2d 937 (1984)).

The *Factor* court's holding is based upon two considerations: (1) an attempt to distinguish the mere "employees" stripped of immunity by PSTCA from "high public officials" who retain common law absolute immunity, and (2) the interpretation of § 8550 in earlier Commonwealth Court decisions. Neither of these rationales is convincing. The language of PSTCA does not support a distinction between high public officials and mere employees, and the prior Pennsylvania Commonwealth Court decisions cited in *Factor* do not counsel the *Factor* court's result.

The *Factor* court wrote that "Section 8550 ... has no bearing on the common law absolute privilege regarding high public officials, but rather addresses only those employees of local agencies who do not fall within the

category of a high public official." 149 Pa. Commw. at 88, 612 A.2d at 594. It is true that § 8550 refers to "employees." However, the attempt to distinguish "employees" who are subject to the immunity stripping of § 8550 from "high public officials" who are not stripped of immunity is belied by the plain language of PSTCA. The Act defines an "employee" as

> Any person who is acting or who has acted on behalf of a government unit whether on a permanent or temporary basis, whether compensated or not and whether within or without the territorial boundaries of the government unit, including ... any elected or appointed officer, member of a governing body or other person designated to act for the government unit.

42 Pa.C.S. § 8501. This sweeping definition simply will not support a distinction between some employees who are "high public officials" and others who are not. As an appointed officer of the Philadelphia Police Department, and as one designated to act for the department, *see* Affidavit of Willie L. Williams, attached as Exhibit "A" to Reply Brief of Defendant Bullick; Deposition of David H. Pingree, attached as Exhibit "D" to Plaintiff's Memorandum in Support of Additional Evidence, Bullick is an "employee" within the meaning of the Act and is stripped of any immunity for his intentional torts. That he might be classified as a high public official for the purposes of common law immunity is irrelevant.[8]

The cases cited by the *Factor* court do not support the conclusion that immunity for high public officials is retained in spite of the immunity stripping language of § 8550.[9] Most of the cases cited do not even discuss common law immunities. To the extent that those immunities are discussed, the cases do not support the *Factor* court's conclusion.

---

ry changes in light of the Supreme Court's decision in *DuBree.*").

**8.** The *Factor* court did not discuss PSTCA's statutory definition of employee. The defendants in *Factor,* the Mayor and Revenue Commissioner of the City of Philadelphia, are an elected officer and an appointed officer, respectively, and thus

fall within the plain language of the Act's definition of "employee."

**9.** We put to one side the question of to what extent the analysis of official immunity in terms of "high public officials" was left intact after the Pennsylvania Supreme Court's decision in *DuBree.*

Only one of the eight cases cited in *Factor* to support the proposition that § 8550 does not abrogate a high public official's immunity even addresses that immunity. *See Yakowicz, supra.* *Yakowicz* dealt with the effect of the statutory codification of sovereign immunity on pre-existing common law immunities of Commonwealth officials.[10] In *Yakowicz,* the Commonwealth Court held that the common law absolute privilege for high public officials is made available to Commonwealth officials by 42 Pa.C.S. § 8524(1), which provides that "[a]n official of a Commonwealth agency ... may assert ... defenses which have heretofore been available to such officials." Because the language of § 8524(1), preserving common law immunities for Commonwealth officials, is similar to that of § 8546(1), preserving common law immunities for employees of local agencies, *Yakowicz* supports the proposition that § 8546(1) grants absolute immunity to local agency employees who are also "high public officials."

While the statutory section preserving common law immunities for Commonwealth officials is similar to that section of PSTCA preserving such immunities for employees of local agencies, the further structure of the immunity codifying statute for Commonwealth officials is fundamentally different from that of PSTCA. While PSTCA contains the immunity stripping § 8550, the codification of immunity for Commonwealth officials *does not contain an immunity stripping section.* Therefore, *Yakowicz*'s holding that high public officials of the *Commonwealth* retain absolute immunity even for their intentional torts is irrelevant to the question of whether or not the immunity is available to any employee of a local agency.

The *Yakowicz* court noted in *dictum* this distinction in the statutory immunity standards for Commonwealth officials and local officials:

We note that the immunity defense provided by the General Assembly to local agencies and their employees in [PSTCA,] 42 Pa.C.S. §§ 8541–8564 is lost to local agen-

cy employees where their actions which cause injury constitute a "crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S. § 8550. This would permit a defamation action based on malicious publication to be brought against a local agency employee. *See Malia v. Monchak,* 116 Pa.Commonwealth Ct. 484, 543 A.2d 184 (1988). The General Assembly has *not* included any such abrogation of the immunity provided to Commonwealth agency employees.

120 Pa.Commw. at 488 n. 5, 548 A.2d at 1334 n. 5. (emphasis in original). Thus, to the extent that *Yakowicz* discusses the effect of § 8550, it agrees with this court's reasoning and not with the holding in *Factor.*

To the extent that the other cases cited by the *Factor* court discuss the immunity stripping of features of § 8550, they also support our conclusion that high public official immunity is *not* available for intentional torts committed by employees of local agencies. In *Lancie,* a defendant police officer contended that he was protected from state law intentional tort claims by "common law official immunity." The Commonwealth Court rejected his argument, holding that while § 8546 preserves common law defenses, that section does not apply in cases of willful misconduct. Similarly, in *Malia,* defendants school principal and superintendent of schools argued that they were granted immunity by § 8546. The court agreed that the terms of that section applied to defendants. However, the court rejected defendants' plea for immunity, stating that "what the statute giveth it also taketh away. Pa.C.S. § 8550 abrogates the immunity defenses provided in sections 8545 and 8546 when the alleged wrongful conduct of the employee constituted a crime, actual fraud, actual malice or willful misconduct." *Malia,* 116 Pa.Commw. at 492, 543 A.2d at 188 (internal quotation marks omitted). Similarly, the other cases cited by the *Factor* court all recognized that § 8550 strips immunity from a local agency's em-

---

**10.** The Pennsylvania Supreme Court abrogated common law sovereign immunity in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978). In response the General Assembly enacted legislation codifying the immunity of the Commonwealth, its officials and employees, currently codified at 42 Pa.C.S. §§ 8521–28. *See Yakowicz,* 120 Pa.Commw. at 483–85, 548 A.2d at 1332.

ployees who engage in this type of conduct. *See McNeal; Scott; Keeler; Acker; Morris.* None of these cases discussed or even mentioned a distinction between a "high public official" and a mere "employee."

Our task as a federal district court sitting in diversity is to apply state law as interpreted by the Pennsylvania Supreme Court. *See Connecticut Mutual Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983). In the absence of a definitive ruling by the state's highest court, we must predict how it would rule. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 378 (3d Cir.1990). In so doing, we "must consider and give due regard to the decisions of State intermediate appellate courts as well as other state courts as indicia of how the state's highest court would decide a matter." *Ciccarelli v. Carey Canadian Mines Ltd.,* 757 F.2d 548, 553 n. 3 (3d Cir. 1985) (citing *Wyman, supra; Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981)). Because the language of PSTCA is clear and unambiguous, we respectfully decline to follow the holding of the Commonwealth Court in *Factor,* and instead hold that PSTCA strips immunity for intentional torts from all employees of local agencies, without making any distinction between those employees who are "high public officials" and those who are not.

## VII. CONCLUSION

The complaint sets forth claims for defamation, *see* Complaint Count I, invasion of privacy by casting plaintiff in a false light, *see* Count II, and intentional infliction of emotional distress, *see* Count III. Because we find that there exist genuine issues of material fact as to whether the broadcast was defamatory and was of and concerning plaintiff, defendants' motions for summary judgment will be denied as to Counts I and II. The motions for summary judgment as to Count III will be granted because defendants' actions do not rise to the extreme and outrageous level needed to sustain a claim for intentional infliction of emotional distress. Because Bullick has conditional immunity under the Political Subdivision Tort Claims Act,

all remaining counts against him must be proved at trial to have been intentional torts.